IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE QUAPAW TRIBE OF OKLAHOMA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Case No. 03-CV-0846-CVE-PJC |
| BLUE TEE CORP., et al., | ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Now before the Court is the Motion of Certain Defendants to Dismiss Plaintiff the Quapaw Tribe's Claims for Medical Monitoring and Brief in Support (Dkt. # 420) and defendant Childress Royalty Company's Motion to Join and Adopt Arguments of Co-Defendants in the Motion of Certain Defendant's to Dismiss Plaintiff the Quapaw Tribe's Claims for Medical Monitoring (Dkt. # 430).[1] Defendants NL Industries, Inc., Blue Tee Corp., Gold Fields Mining, LLC, The Doe Run Resources Corporation, and Childress Royalty Company ("mining defendants") argue that the Quapaw Tribe of Oklahoma ("the Tribe") lacks standing to pursue relief in the form of medical monitoring, because any claim for medical monitoring belongs to the individual tribal members rather than the Tribe.[2]

---

[1]  Defendant Childress Royalty Company's ("Childress") motion to adopt the motion to dismiss plaintiffs' claim for medical monitoring is unopposed and the Court finds that the motion (Dkt. # 430) should be granted.

[2]  The Tribe requests medical monitoring in connection with its claims for public nuisance (Count 1), strict liability (Count 4) and negligence (Count 5) in its fourth amended complaint. In both the public nuisance and negligence claims, the Tribe, not the individual plaintiffs, is seeking injunctive relief in the form of medical monitoring.

**I.**

The Tar Creek Superfund Site ("Tar Creek") is located in Ottawa County, Oklahoma and comprises approximately 40 square miles. Beginning in the early 1900s, Tar Creek was site of significant mining activity, and the primary metal for which companies mined was lead. By 1970, most of the mining companies had ceased activities in Tar Creek, but almost 70 years of mining waste had accumulated in the form of chat piles and tailings ponds. Mining waste has caused significant damage to the natural resources of the area and has allegedly made the area dangerous for human habitation as well. The Environmental Protection Agency ("EPA") placed Tar Creek on the National Priorities List in 1981 and began remedial work in 1982. The EPA is still working to clean up the mining waste at Tar Creek, and no estimated date for completion of the EPA's work has been announced.[3]

The Tribe is a federally recognized Indian tribe and its earliest dealings with the federal government date back to 1818. After several treaties between the Tribe and the federal government were broken and renegotiated, the Tribe moved into the current historic boundaries of the Quapaw Reservation in 1839. In 1893, the reservation was divided among tribal members in the form of allotments, and the Secretary of the United States Department of the Interior ("DOI") approved the allotments in 1896. Before the Tribe allotted its land, lead and zinc were discovered within the Quapaw Reservation as early as 1891. In 1897, Congress passed a law permitting competent tribal members to enter mining leases, but the statute permitted the DOI to lease restricted land to mining companies if a tribal member were deemed incompetent. The Tribe alleges that, by 1943, almost

---

[3] The Tribe challenges the EPA's diligence when conducting a remedial investigation and feasibility study of Tar Creek, but that issue is not before the Court in connection with the mining defendants' motion to dismiss the Tribe's claim for medical monitoring.

40 percent of the restricted land within the Quapaw Reservation had been leased to mining companies, because every tribal landowner had been declared incompetent by the DOI. Rather than require mining companies to dispose of waste materials, DOI form leases required mining companies to leave on the surface any chat left over from the milling process, because chat could potentially be re-milled by the mining companies or sold by the landowners.

The Tribe claims that mining waste has caused serious health problems for tribal members up to the present time. According to the Tribe, long-term exposure to low-levels of lead can cause reduced intelligence levels and behavioral disorders in children, and there is no known safe blood lead level for children. In 1994, the Indian Health Service of the United States Department of Health and Human Services ("IHS") tested the blood lead levels of children living on the Quapaw Reservation, and test results indicated that 34 percent of the Tribe's children had a blood lead level in excess of the Center for Disease Control's ("CDC") minimum level of concern.[4] Based on the presence of mining waste and the test results, the Tribe alleges that tribal members living on the reservation face a serious health risk and should be monitored for adverse health risks associated with lead exposure. The Tribe argues that Indian tribes have a special relationship with tribal members, and "[t]ribal governments in tribes like the Quapaw Tribe sit not only as representative political bodies but as tribal leaders with unique responsibilities dictated by culture and tradition to care for the members of the tribe." Dkt. # 437, at 8. Thus, the Tribe asserts that it has a duty to

---

[4] Although the Tribe claims that any amount of lead in a child's blood is hazardous, the CDC has established a minimum level of concern to provide guidance for physicians when treating children with lead exposure. The current minimum level of concern established by the CDC is 10 micrograms per deciliter ("ug/dL").

monitor the health and well-being of its members, and it should be permitted to seek relief in the form of a court-supervised medical monitoring program.

On December 10, 2003, the Tribe and certain tribal members filed this lawsuit against the mining defendants.[5] Plaintiffs originally sought to certify a class of former or current landowners whose property had been damaged by the mining defendants' actions and the Tribe alleged common-law tort claims against the mining defendants under the parens patriae doctrine. Plaintiffs requested compensatory and punitive damages in an unspecified amount from the mining defendants, but the complaint did not request relief in the form of medical monitoring. Several defendants filed a motion to dismiss, arguing that it was not clear from the complaint if the Tribe had parens patriae standing to allege many of the claims in the complaint. Dkt. # 60, at 10. The Tribe defended against this argument by stating that:

> The cases cited by Defendants stand for the proposition that a sovereign may sue to protect its sovereign or "quasi-sovereign" interests, including the interest in clean air and water. Under these holdings, a state may not assert the rights of private individuals, but at the same time a *parens patriae* action does not preclude the recovery by private individuals for claims arising out of the same facts and circumstances. . . . Hence, individual members of the tribe can bring their claims, in the form of a class action, along with the distinct claims of the sovereign Quapaw Tribe for recovery of natural resource damages under the public trust doctrine and for damages arising in torts [sic] to the interests of all members of the tribe. It is implicit that the claims of the sovereign are for the recovery of natural resource damages and damages relating to the lands owned by the Tribe alone, while the claims of the individual named Plaintiffs and the class they represent go to their privately held interests only.

Dkt. # 105, at 8 (internal citations omitted). Plaintiffs subsequently sought leave of court to amend their complaint to add federal defendants and to clarify that the individual plaintiffs were not seeking

---

[5]  The original complaint named Asarco, Inc. ("Asarco") as a defendant, but plaintiffs subsequently withdrew their claims against Asarco.

4

damages for personal injuries. Dkt. # 138, at 6-7. The Court granted plaintiffs' motion to amend and plaintiffs filed an amended complaint on May 5, 2004. The amended complaint did not mention medical monitoring.

The mining defendants filed counterclaims against the Tribe for recoupment, arguing that the Tribe waived sovereign immunity to the counterclaims by filing this lawsuit. The Court agreed and denied the Tribe's motion to dismiss the counterclaims. On August 27, 2004, plaintiffs appealed the Court's ruling denying plaintiffs' motion to dismiss the mining defendants' counterclaims for recoupment. This Court stayed the case while plaintiffs' appeal was pending before the Tenth Circuit Court of Appeals, and the Tenth Circuit did not issue its decision until February 22, 2006. The Tenth Circuit held that the mining defendants' counterclaims were compulsory counterclaims sounding in recoupment and, under Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324 (10th Cir. 1982), the Tribe waived sovereign immunity to the mining defendants' counterclaims. Berrey v. Asarco, Inc., 439 F.3d 636 (10th Cir. 2006). The parties advised the Court that settlement discussions had been productive and they requested additional time to continue settlement talks. The Court extended the stay of the case until January 31, 2007 to permit the parties to complete settlement discussions.

Plaintiffs filed a second amended complaint on April 20, 2007, adding a claim under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), and adding Burlington Northern and Sante Fe Railway Company ("Burlington Northern") as a party. The Tribe also sought "medical monitoring on behalf of its members, and [sought] the costs of all medical screenings, assessments, and monitoring of its members to detect possible physical injury to its members." Dkt. # 330, at 50. In the alternative, the individual

plaintiffs sought medical monitoring on behalf of all members of the Quapaw tribe and asked the Court to certify a medical monitoring class under Fed. R. Civ. P. 23. In June 2007, plaintiffs filed a third amended complaint deleting all class allegations and removing any request for medical monitoring for the individual plaintiffs. However, the Tribe continued to assert a claim for medical monitoring on behalf of its members.

On October 29, 2007, plaintiffs filed a fourth amended complaint to include allegations that the EPA had not diligently proceeded with a remedial investigation and feasibility study at Tar Creek. The fourth amended complaint further explains the scope of the Tribe's request for medical monitoring:

> Plaintiff Quapaw Tribe also seeks injunctive relief in the form of the creation of a court-supervised medical monitoring program funded by the Non-Federal Defendants with the Quapaw Tribe as trustee acting on behalf of its members. The funding by the Non-Federal Defendants shall include the costs of all medical screenings, assessments, and any other reasonable costs associated with monitoring of the members of the Quapaw Tribe to detect possible physical injury to members of the Quapaw Tribe. The medical monitoring program shall include, but not be limited to, the medical testing of exposed Quapaws for detection of disease, a registry of exposed Quapaws, population-based health surveys, and the pooling of data derived from the medical tests of the exposed Quapaws in order to achieve earlier detection of latent diseases.

Dkt. # 449, at 50-51. The mining defendants have filed a motion to dismiss the Tribe's claim for medical monitoring because, even if the Tribe has parens patriae standing to assert certain claims, any claim for medical monitoring is a personal injury claim belong to an injured Tribal member.

## II.

When reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. Moffett v. Halliburton Energy Services, Inc., 291 F.3d 1227, 1231 (10th Cir.

2002). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Sutton v. Utah State School for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).

### III.

The mining defendants argue that the Tribe lacks standing to request a court-supervised medical monitoring program, because a claim for medical monitoring belongs each individual tribal member rather than the Tribe.[6] The Tribe responds that it has a quasi-sovereign interest in the health and well-being of its members, and it should be permitted to seek medical monitoring on behalf of its members.

### A.

In its fourth amended complaint, the Tribe alleges that it has standing to pursue medical monitoring on behalf of its members under the parens patriae doctrine. A state or governmental entity may not appear in a civil action as a nominal party to pursue the claims of individual citizens, but a state "may act as the representative of its citizens in original actions where the injury alleged

---

[6] The mining defendants do not concede that Oklahoma law permits any person, including an Indian tribe, to obtain medical monitoring as injunctive relief. The Tribe has not cited any legal authority that medical monitoring is a viable remedy under Oklahoma law but, as defendants have reserved this issue for another day, the Court will assume without deciding that the medical monitoring is available as a remedy in this case. However, the Court notes that the Tribe may not use the parens patriae doctrine to expand the remedies available under Oklahoma law. See New Mexico v. Gen. Elec. Co., 467 F.3d 1223, 1243 n.30 (10th Cir. 2006) (parens patriae doctrine can not be used to expand a party's rights under substantive state law).

affects the general population of a State in a substantial way." Maryland v. Louisiana, 451 U.S. 725 (1981). To have standing to file a claim in federal court, a state must be asserting an injury in a sovereign or quasi-sovereign capacity. Massachusetts v. EPA, 127 S.C. 1438, 1454 (2007); Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907).

In Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592 (1982), the Supreme Court discussed the requirements for a state or governmental entity to bring a parens patriae action. A state has standing to protect its sovereign interests in (1) enacting and enforcing a legal code; (2) demanding recognition from other sovereign entities; and (3) protecting the state's proprietary interests. Id. at 601. In some circumstances, a governmental entity may have standing to protect a "quasi-sovereign interest" separate and apart from the three types of sovereign interests noted above. While a state undoubtedly has standing to file a lawsuit to protect its sovereign interests, the circumstances when a state may file a parens patriae action asserting the rights of its citizens are more limited. In Snapp, the Supreme Court provided the following guidelines for the filing of a parens patriae action:

> In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development-neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract-certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.
>
> The Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its

> population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking process.

Id. at 607-08.

Snapp created a limited exception to the ordinary standing requirements under Article III of the United States Constitution, but this exception has been narrowly construed. Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 335 (1st Cir. 2000). To establish parens patriae standing under Snapp, the plaintiff must allege the following three elements: "(1) the State must have 'alleged injury to a sufficiently substantial segment of its population;' (2) the State 'must articulate an interest apart from the interests of particular private parties;' and (3) the state 'must express a quasi-sovereign interest.'" Connecticut v. Physicians Health Servs. of Connecticut, Inc., 103 F. Supp. 2d 495 (D. Conn. 2000). The governmental entity must also show that the threatened injury is not speculative. Table Bluff Reservation v. Philip Morris, Inc., 256 F.3d 879 (9th Cir. 2001); Chiles v. Thornburgh, 865 F.2d 1197, 1208 (11th Cir. 1989); People of State of Illinios v. Life of Mid-America Ins. Co., 805 F.2d 763 (7th Cir. 1986). The Tenth Circuit has been clear that a governmental entity does not have standing to "assert the rights of private individuals." Satsky v. Paramount Communications, Inc., 7 F.3d 1464, 1469 (10th Cir. 1993).

Indian tribes, like states and other governmental entities, have standing to sue to protect sovereign or quasi-sovereign interests. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976) (Indian tribe had standing as a tribe, apart from the claims of individual tribal members, to challenge state motor vehicle tax); Prairie Band of Potowatomi Indians v. Pierce, 253 F.3d 1234, 1241 (10th Cir. 2001) (tribe had standing to sue Kansas to prevent interference with or infringment on tribe's right to self-government). A tribe can

have standing to sue to protect its own interests or, in appropriate situations, the interests of its members through a parens patriae action. Delorme v. United States, 354 F.3d 810 (8th Cir. 2004). Regardless of whether a tribe files a claim in its sovereign capacity or on behalf of its members, it must still prove an injury-in-fact sufficient to satisfy the standing requirement of Article III of the United States Constitution. Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc., 256 F.3d 879, 885 (9th Cir. 2001). In particular, when filing a parens patriae action, a tribe must show that all or a substantial portion of its members have suffered an injury. United States v. Santee Sioux Tribe of Nebraska, 254 F.3d 728 (8th Cir. 2001).

**B.**

The Court will first consider whether all or a substantial part of the Tribe's population has allegedly suffered an injury from exposure to lead. In its fourth amended complaint, the Tribe alleges that "more than one-third of Quapaw children have been found to have blood lead levels that are known to cause adverse health effects." Dkt. # 449, at 36. In 1994, IHS conducted a survey of Quapaw children and found that 34 percent of these children had blood levels in excess of the CDC's minimum level of concern. An important part of the Tribe's claim for injury is the threat of future injury caused by lead deposits, because the Tribe alleges that lead does not bio-degrade over time and tribal members face a risk of injury from the mining defendants' chat piles and tailings ponds. The mining defendants respond that many tribal members do not live within the current historic boundaries of the Quapaw Reservation, and the mere fact of tribal membership does not create a risk of injury from exposure to lead.

The Court finds that the Tribe has alleged an injury to a substantial segment of its population for the purposes of establishing parens patriae standing. Courts have not imposed a numerical

threshold on the percentage or number of citizens that must suffer an injury before a governmental entity has parens patriae standing. See Snapp, 458 U.S. at 607 (parens patriae standing must be evaluated on a case-by-case basis); New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 471 (S.D.N.Y. 2006) (injury can be a sufficient magnitude to support parens patriae standing even if a relatively small number of persons allege a direct injury from the defendant's actions); Connecticut, 103 F. Supp. 2d at 504 ("there is no magic number of affected citizens necessary to establish *parens patriae* standing"); People by Vacco v. Mid Hudson Med. Group, P.C., 877 F. Supp. 143, 148 (S.D.N.Y. 1995) ("the raw number of individuals directly involved does not determine whether the State has 'alleged injury to a sufficiently substantial segment of its population'"). The Tribe has alleged that 34 percent of children living on the Quapaw Reservation have blood lead levels in excess of the CDC's minimum level of concern. The Tribe also alleges that lead does not bio-degrade and this rate of injury will likely continue until the lead waste is removed. Defendants do not contest that the Tribe has satisfied this part of the Snapp analysis, and it is clear that a significant percentage of the Tribe's residents have allegedly been injured by exposure to lead. Therefore, the Tribe has established that it seeks to recover for any injury allegedly suffered by a substantial segment of its population for purposes of parens patriae standing.[7]

**C.**

---

[7] The Court notes that, although the Tribe has alleged an injury to a substantial segment of its population, this does not mean that the Tribe is the proper party to bring a claim for medical monitoring. This part of the Snapp analysis is discussed below. See III(D), infra.

The Tribe argues that it has a quasi-sovereign interest in the health and well-being of tribal members.[8]  Dkt. # 437, at 9.  It is well-established that, under the proper circumstances, a governmental entity has standing to sue to protect the health of its citizens.  Snapp, 458 U.S. at 607; Connecticut v. Cahill, 217 F.3d 93, 97 (2d Cir. 2000); State ex rel. Sullivan v. Lujan, 969 F.2d 877, 883 (10th Cir. 1992); In re Edmond, 934 F.2d 1304 (4th Cir. 1991); Pennsylvania v. Kleppe, 533 F.2d 668, 671 (D.C. Cir. 1976).  The mining defendants do not challenge the Tribe's assertion that it has a general quasi-sovereign interest in the health and well-being of its members.  See Dkt. # 441, at 1-3.  However, the mining defendants argue that the assertion of a quasi-sovereign interest, without a clear showing that the Tribe is not attempting to assert the rights of private individuals, does not provide the Tribe with standing to seek medical monitoring on behalf of all of its citizens.

The Tribe is correct that a governmental entity can have parens patriae standing to protect the health and well-being of its members by seeking the abatement of a public nuisance.  See North Dakota v. Minnesota, 263 U.S. 365 (1923) (state has quasi-sovereign interest in preventing another state from draining excess water into interstate waterway);  Georgia v. Tennessee Copper Co., 206 U.S. 230 (1907) (state could file a parens patriae action to ensure "that the air over its territory should not be polluted on a great scale by sulphurous acid gas" emitted by the defendant's mining operation); Kansas v. Colorado, 185 U.S. 125 (1902) (Kansas could proceed with lawsuit against Colorado alleging that Colorado's diversion of water from the Arkansas River harmed Kansas' citizens); Missouri v. Illinois, 180 U.S. 208 (1901) (Missouri could seek to enjoin the city of

---

[8]  The mining defendants do not dispute the Tribe's claim that it has a quasi-sovereign interest in the health of its members.  However, the mining defendants do not concede that the existence of a general quasi-sovereign interest permits the Tribe to raise any conceivable claim to protect its members.  The Court will address the mining defendants' argument when it considers the Tribe's interests in comparison to the interests of individual members of the Tribe.

Chicago from dumping sewage into the Mississippi River). Although the cited cases were filed as original actions in the Supreme Court, they stand for the general principle that a state, on behalf of its citizens, may seek injunctive relief for conduct harmful to the state's natural resources.

The Tribe relies heavily on State of Alaska v. Native Village of Curyung, 151 P.3d 388 (Alaska 2006), to support its claim that it has a quasi-sovereign interest in the health and well-being of its members. In Curyung, the Supreme Court of Alaska held that native villages had parens patriae standing to proceed with a claim under 42 U.S.C. § 1983 alleging ongoing and population-wide violations of the Adoption Assistance Act, 42 U.S.C. § 620 et seq., and the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq. The Curyung court found that, in the context of a civil rights action, the native villages could articulate a collective injury that could not be completely addressed through individual lawsuits, and stated:

> Quasi-sovereign interests, which a state may protect in court through the mechanism of *parens patriae* actions, are those interests "that the State has in the well-being of its populace." In a *parens patriae* action, a state may not simply aggregate the claims of its citizens. Rather, the state must be able to articulate an injury to the well-being of the state as a whole or to a sufficiently large segment of the population, and the overall injury must be more that the mere sum of its parts. . . . For example, the Third Circuit has held that because the state generally has a broad interest in protecting its citizens from civil rights violations, a state may bring an action in *parens patriae* to enforce civil rights statutes, even though private individuals, would have had a cause of action under the same statutes. Because the state's interests will usually not be completely addressed by individual lawsuits brought by aggrieved individual, courts have allowed the state to sue as *parens patriae.*

Id. at 399-400. The Supreme Court of Alaska was clear that it was considering the application of the parens patriae doctrine in civil rights cases. Because the native villages were seeking to remedy alleged civil rights violations on a population-wide basis and individual lawsuits would not provide a complete remedy for native villagers, the native villages had standing to file a § 1983 claim on behalf of their citizens. Id. at 401.

13

The Court finds that the Tribe has asserted a quasi-sovereign interest in the health and well-being of its members. However, the cases cited by the Tribe do not support the proposition that the scope of the quasi-sovereign interest is sufficiently broad to include the Tribe's claim for medical monitoring. The Court must still examine whether a claim for medical monitoring belongs solely to the affected tribal member or whether the Tribe also has standing to seek this type of relief. Contrary to the Tribe's suggestion, cases showing that a state may file a <u>parens</u> <u>patriae</u> action for abatement of a nuisance do not directly apply to the Tribe's request for medical monitoring. Likewise, <u>Curyung</u> does not stand for the proposition that an Indian tribe has standing to address every wrong suffered by individual citizens, because <u>Curyung</u> dealt with alleged violations of the civil rights of native villagers. While the Tribe certainly has standing to pursue some claims based on its quasi-sovereign interest in the health and well-being of its members, the Court must consider whether the Tribe has standing to proceed with this claim for medical monitoring on behalf of the Tribe's members.

**D.**

The final consideration is whether the Tribe has stated an interest separate and apart from the interests of individual tribal members. To distinguish its request for medical monitoring from an ordinary personal injury claim, the Tribe argues that its request for medical monitoring is a claim for injunctive relief rather than a claim for monetary damages. According to the Tribe, its request for injunctive relief is broader than a claim that could be filed by any individual tribal member, and it has a common interest in protecting the health of its members from the harmful effects of low-level lead exposure. The mining defendants respond that, even if the Tribe has standing to assert

certain claims, the Tribe lacks standing to request medical monitoring because, based on Tenth Circuit precedent, a claim for medical monitoring belongs to the injured person only.

The mining defendants argue that a claim for medical monitoring is inherently personal and any such claim belongs to the tribal member only. The Tenth Circuit has found that a claim for medical monitoring generally qualifies as a personal injury claim, and has identified four essential elements for most medical monitoring claims:

> 1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.
>
> 2. As a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.
>
> 3. That increased risk makes periodic diagnostic medical examinations reasonably necessary.
>
> 4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

Building and Construction Dep't v. Rockwell Int'l Corp., 7 F.3d 1487 (10th Cir. 1993) (quoting In re Paoli R.R. Yard PCB Litigation, 916 F.2d 829, 852 (3d Cir. 1990)); see also Daigle v. Shell Oil Co., 972 F.2d 1527 (10th Cir. 1992) ("Plaintiffs' request for medical monitoring to allow 'prevention or early detection and treatment of chronic disease' smacks of a cause of action for damages resulting from personal injury."). Based on this precedent, the mining defendants contend that a claim for medical monitoring is personal and, therefore, the Tribe lacks standing to obtain this particular type of relief in a parens patriae action.

The Tribe attempts to avoid classification of its request for medical monitoring as a personal injury claim by framing the requested relief as injunctive rather than monetary. However, the type of remedy has no effect on the nature of the Tribe's claim for medical monitoring. From the face

of the fourth amended complaint, it is clear that the Tribe is asking for establishment of a medical-monitoring program, funded by defendants, "to detect possible physical injury to members of the Quapaw Tribe." Dkt. # 449, at 51. The type of relief does not change the nature of the underlying claim. See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180 (9th Cir. 2001) ("medical monitoring relief is appropriate only as an element of damages after independent proof of liability"); Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 479 (D. Colo. 1998) (the plaintiffs' attempt to frame medical monitoring relief as injunctive did not change the individualized and distinct nature of the injuries suffered by each plaintiff in a putative class action); In re Telectronics Pacing Systems, Inc., 168 F.R.D. 203, 215-16 (S.D. Ohio 1996) (recognizing that most states treat a request for medical monitoring as element of damages for a personal injury claim rather than as an independent cause of action). The Tribe alleges that its members have suffered or will suffer personal injuries from exposure to lead and, although each person may be a tribal member, the injury is suffered by the individual. Even if the Court were to treat the Tribe's request for medical monitoring as a claim for injunctive relief, the alleged injury is inherently personal to each tribal member.

In Satsky v. Paramount Communications, Inc., 7 F.3d 1464 (10th Cir. 1993), the Tenth Circuit discussed the type of claims that may be litigated by a state in a parens patriae action. Satsky was filed by a group of plaintiffs alleging that Paramount Communications, Inc. ("Paramount") was liable under CERCLA and various common-law theories of recovery for mining waste produced in Eagle County, Colorado. Paramount had previously been sued by the state of Colorado and the parties entered into a consent decree requiring Paramount to dispose of mining waste in the areas surrounding Eagle Mine and Eagle River. The Satsky plaintiffs alleged that Paramount's waste disposal activities, taken as a result of the consent decree, were harmful to the plaintiffs and the

Satsky plaintiffs sought monetary and injunctive relief from Paramount. Paramount argued that the plaintiffs' claims were barred by res judicata, because the state had previously litigated the same claims against Paramount in a previous lawsuit. Id. at 1467. The district court agreed and dismissed all of the plaintiffs' common-law claims against Paramount. The Tenth Circuit reversed the district court, because the state lacked standing to raise certain claims on behalf of the individual plaintiffs in its previous parens patriae action. Because the state lacked standing to litigate claims belonging solely to the individual plaintiffs, these claims could not be barred by res judicata. The Tenth Circuit stated:

> The extent to which plaintiffs are barred, then, turns on the nature of the rights asserted by them. Plaintiffs claim injuries to "property damage, diminution of value to real estate, loss of income and other economic losses including loss of asset value, increased operating expenses, increased costs of personal protection from contaminated domestic water or the threat of contaminated domestic water, loss of water quality or quantity, loss or enjoyment of real property, mental anguish, and emotional distress and an increased risk of harm and an increased risk of contracting fatal or otherwise serious illnesses." To the extent these claims involve injuries to purely private interests, which the State cannot raise, then the claims are not barred. By "purely private interests," we mean claims that the State has no standing to raise.

Id. at 1470. The case was remanded to the district court for a determination of which claims were purely personal and which claims were barred by the state's consent decree with Paramount.

Even though the Tribe requests "injunctive relief in the form of the creation of a court-supervised medical monitoring program funded by the Non-Federal Defendants," the Tribe primarily seeks funding for the treatment of personal injuries of individual tribal members. Dkt. # 449, at 50. From the mining defendants' perspective, it makes no difference if the relief requested is injunctive or monetary because, either way, plaintiffs are simply asking the mining defendants to pay a sum of money to fund the medical monitoring program. The personal nature of a medical monitoring remedy is clear when the Court considers the underlying claims. The Tribe seeks medical

monitoring in connection with its claims for public nuisance and negligence, and a necessary part of each of these claims under Oklahoma law is causation. Twyman v. GHK Corp., 93 P.3d 51, 54 n.4 (Okla. Civ. App. 2004) ("Causation is a necessary element in proving both negligence and nuisance actions."). The mere existence of a nuisance, without proof of personal injury, would arguably not permit the Court to award relief in the form of a court-supervised medical monitoring program. See Stroud v. Arthur Andersen & Co., 37 P.3d 783, 788-89 (Okla. 2001) (tort damages available only injuries "which are foreseeable and naturally flow from" the defendant's conduct); Johnson v. Mid-South Sports, Inc., 806 P.2d 1107, 1115 (Okla. 1991) (same). It is not clear how the Tribe could obtain medical monitoring relief without focusing on the personal injuries suffered by individual tribal members.

The Tribe does not have standing to obtain medical monitoring on behalf of tribal members, because the Tribe has not asserted a common interest apart from the personal injuries suffered by the individual tribal members. The Tribe argues that it may seek medical monitoring on behalf of the entire Tribe, even though the requested relief clearly implicates the private rights of some tribal members. Dkt. # 437, at 18. However, the Tenth Circuit has classified a claim for medical monitoring as personal and, in Satsky, the Tenth Circuit held that a governmental entity lacked parens patriae standing to file a lawsuit asserting the "purely private interests" of its citizens. Satsky, 7 F.3d at 1470. The Tribe devotes much of its response to the unique nature of its relationship with its members, but this does not provide any legal basis for the Court find that

personal injury claims of tribal members can be asserted by the Tribe.[9] If the Court were to permit the Tribe to proceed with its claim for medical monitoring, this would not bar individual tribal members from bringing their own claims against the mining defendants. This result would violate the Tenth Circuit's holding in Satsky and would subject the mining defendants to a risk of double recovery.[10] The Tribe is attempting to use the parens patriae doctrine to assert the personal claims of its members and obtain relief that is personal in nature. Therefore, the Tribe is not alleging an interest separate and apart from that of its members, and it does not have standing to seek medical monitoring under the parens patriae doctrine.

---

[9]     In a separate case, Cole v. Asarco, Inc., 03-CV-327-GKF-PJC ("Cole"), a group of plaintiffs is seeking to certify a medical monitoring class composed "of all persons who have lived in the Class Area." Cole, Dkt. # 219, at 2. The relief sought in Cole is similar the court-supervised medical monitoring program requested by the Tribe in this case. The Tribe has filed a motion to intervene in Cole and acknowledges that the putative class "necessarily includes the Quapaw Tribe and its members." Id., Dkt. # 250, at 4. Although it appears that the Tribe does not approve of the remedy sought in Cole, the individual tribal members could obtain the relief requested in this case either as potential class members in Cole or individually. Therefore, the individual tribal members still have a remedy, even though the Tribe lacks standing to seek medical monitoring in this case.

[10]    The Tribe asserts that the mining defendants' concerns about a potential double recovery can be alleviated through a claims processing procedure requiring tribal members to abandon their personal claims if they participate in the medical monitoring program. However, it appears that the Tribe envisions a procedure where tribal members could opt out of the medical monitoring program. See Dkt. # 437, at 19. The fact that the Tribe never intended to preclude its members from bringing personal claims against the mining defendants is a strong indication that the Tribe lacks standing to pursue a claim on behalf of its members.

**IT IS THEREFORE ORDERED** that the Motion of Certain Defendants to Dismiss Plaintiff the Quapaw Tribe's Claims for Medical Monitoring and Brief in Support (Dkt. # 420) is **granted**.

**IT IS FURTHER ORDERED** that defendant Childress Royalty Company's Motion to Join and Adopt Arguments of Co-Defendants in the Motion of Certain Defendant's to Dismiss Plaintiff the Quapaw Tribe's Claims for Medical Monitoring (Dkt. # 430) is **granted**.

**DATED** this 28th day of December, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT