# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

THE QUAPAW TRIBE OF OKLAHOMA,          )
et al.,                                )
                                       )
                    Plaintiffs,        )
                                       )
v.                                     )        **Case No. 03-CV-0846-CVE-PJC**
                                       )
BLUE TEE CORP., et al.,                )
                                       )
                    Defendants.        )

## OPINION AND ORDER

Now before the Court are the following motions: Federal Defendants' Motion for Judgment

on the Pleadings (Dkt. # 427)[1]; Federal Defendants' Combined Motion for Summary Judgment and

Memorandum in Support (Dkt. # 484); and Plaintiffs' Motion for Partial Summary Judgment and

Brief in Support (Dkt. # 506).  The motions for summary judgment address the issue of whether the

Environmental Protection Agency ("EPA") is "diligently proceeding with a remedial investigation

and feasibility study" at the Tar Creek Superfund Site ("Tar Creek").  This issue must be resolved

before the Court can rule on the federal defendants' (the United States of America and Dirk

Kempthorne, in his official capacity as Secretary of the Department of the Interior) motion for

judgment on the pleadings.  The non-federal defendants have filed responses (Dkt. ## 531, 532)

taking no position on the pending motions.  However, they note that if the Quapaw Tribe of

Oklahoma's ("the Tribe") claim under the Comprehensive Environmental Response, Compensation,

---

[1]     The motion for judgment on the pleadings (Dkt. # 427) seeks judgment based on the
allegations of plaintiffs' third amended complaint (Dkt. # 367), but plaintiffs have
subsequently filed a fourth amended complaint (Dkt. # 449).  The parties agree that the legal
arguments raised in the motion for judgment on the pleadings apply to the fourth amended
complaint as well.

and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA") is dismissed as to the federal defendants, it should be dismissed as to the non-federal defendants as well.[2]

## I.

Early in the twentieth century, significant deposits of lead and zinc were discovered in southeastern Kansas and northeastern Oklahoma and mining for these minerals followed shortly after this discovery. This area became known as the Tri-State Mining District. Originally, mining activities were relatively small operations, but in the 1920s larger mining companies operated in the Tri-State Mining District. The peak years of mining production occurred during the 1920s, but mining continued until the 1970s. Mining companies removed ore from the ground, stripped the ore of any valuable metals, and deposited waste material on the surface. Millions of tons of waste were left in Tar Creek in the form of chat piles and tailings ponds. Chat was created when mining companies stripped material of its useful ore and the remaining byproduct, chat, was stored on the surface in the form of chat piles. Tailings, another byproduct of mining activity, was left in unlined flotation ponds on the surface. For the purposes of the pending motions, the parties generally agree

---

[2]     The Tribe's CERCLA claim is the sixth claim for relief in its fourth amended complaint (Dkt. # 449) and the Tribe, rather than the individual plaintiffs, is the sole party with standing to proceed with a natural resources damages ("NRD") claim under CERCLA. Although plaintiffs' motion for summary judgment and other documents recite that they are filed by "plaintiffs," the documents were filed on behalf of the Tribe and the Court will refer to the relevant plaintiff as the Tribe throughout this Opinion and Order.

that Tar Creek is heavily contaminated and the environmental consequences of seventy years of

mining have been severe.[3]

EPA's History at Tar Creek

In 1980, Congress passed CERCLA due to the "serious environmental and health risks posed

by industrial pollution."  United States v. Bestfoods, 524 U.S. 51 (1998).  As part of the effort to

clean up hazardous waste sites, Congress created the National Priorities List ("NPL"), which is a

"list of sites where releases have occurred that have the highest national priority for remediation

efforts." Morrison Enterprises v. McShares, Inc., 302 F.3d 1127, 1132 (10th Cir. 2002).  Once a site

is designated as a Superfund site, the EPA must conduct a remedial investigation and feasibility

study ("RI/FS").  Federal regulations define an RI as:

> a process undertaken by the lead agency to determine the nature and extent of the
> problem presented by the release.  The RI emphasizes data collection and site
> characterization, and is generally performed concurrently and in an interactive
> fashion with the feasibility study.  The RI includes sampling and monitoring, as
> necessary, and includes the gathering of sufficient information to determine the
> necessity for remedial action and to support the evaluation of remedial alternatives.

40 C.F.R. § 300.5.  An FS more closely concerns the evaluation of possible remedies rather than the

broad investigation of a possible environmental hazard.  Regulations define an FS as a:

> study undertaken by the lead agency to develop and evaluate options for remedial
> action.  The FS emphasizes data analysis and is generally performed concurrently
> and in an interactive fashion with the [RI].  The RI data are used to define the
> objectives of the response action, to develop remedial action alternatives, and to

---

[3]     The Tribe has provided extensive evidence of the scope of contamination at the Tar Creek.
Based on the evidence presented with the pending motions, it is clear that neither the Tribe
nor the federal defendants are contesting the fact that mining waste is present and that a
significant level of contamination exists at Tar Creek. Therefore, it is not necessary for the
Court to fully discuss the scope of contamination at Tar Creek except to the extent necessary
to describe the EPA's actions at Tar Creek.

undertake an initial screening and detailed analysis of the alternatives. The term also refers to a report that describes the results of the study.

Id. Following the completion of an FS, the EPA must follow a two-step process to select a final remedy. First, the EPA selects the preferred remedy and presents the proposed plan to the public for "review and comment." 40 C.F.R. § 300.430(f)(ii). Second, the EPA must review the public comments and consult with the state (or Indian tribe) to determine if the selected remedy is appropriate. Id. The final remedy is documented in a record of decision ("ROD") showing "all facts, analyses of facts, and site-specific policy determinations considered in the course of carrying out activities." Id. at § 300.430(f)(5)(i). The EPA may work toward a comprehensive resolution of the environmental hazards at a complex site by dividing its remedial action into operable units. Id.

In 1983, the Environmental Protection Agency placed approximately 40 square miles of northeastern Oklahoma on the NPL and designated the area as the Tar Creek Superfund Site. The EPA's initial investigation -- RI/FS -- identified two risks associated with contamination of groundwater and surface water caused by pollutants in mine shafts. The EPA was concerned that pollutants discovered in the water sources could potentially contaminate drinking water and kill wildlife and biota in Tar Creek. The EPA initially determined that chat piles and tailings ponds did not pose a health risk to humans or the environment.

The cleanup of groundwater and surface water was designated as Operable Unit 1 ("OU1") and a ROD was issued on June 6, 1984, selecting a remedy for OU1. The remedy included surface water diversion, construction of dikes, and plugging wells to prevent acid mine water migration. Dkt. # 484-6, at 4-5. The EPA also recommended periodic monitoring of groundwater and surface water to ensure that the selected remedy was working. The State of Oklahoma completed the work

4

recommended in the ROD by 1986 and the EPA continues to conduct monitoring of groundwater in compliance with the ROD for OU1.  By 1991, the EPA had no plans to conduct any further work at Tar Creek.

The EPA conducted a five year review of Tar Creek in 1994,[4] and discovered that local children had elevated blood lead levels.  Indian Health Service sent a letter to the EPA stating that 34 percent of the children it tested had blood lead levels exceeding the minimum level of concern established by the Center for Disease Control ("CDC").  Based on its five year review, the EPA determined that additional investigation and a soil removal action were needed to address the elevated blood lead levels of local children.  The sampling of the time-critical removal action was divided into two phases.  First, the EPA tested for lead, arsenic, cadmium and zinc at high access areas, such as schools, parks, and day care centers.  Next, beginning on March 21, 1996, the EPA sampled soil at approximately 2,000 residential properties within Tar Creek.  In addition to soil sampling, the EPA conducted air monitoring and compared the results of the monitoring to results from other Superfund sites within the former Tri-State Mining District.  Test results established that the primary source of lead exposure for children was hand-to-mouth ingestion of lead through contaminated dust or soil rather than windblown chat.  In September 1996, the EPA began time-critical removal of soil in high access areas before the testing of residential areas was completed.  After soil removal was completed in high access areas, the EPA generated a list prioritizing soil removal from residential yards.

---

[4]     The Tribe cites the EPA's failure to conduct a five year review by 1989, or five years from the issuance of the ROD for OU1, as evidence of the EPA's lack of diligence.  Dkt. # 506, at 9.  However, the federal defendants point out that this requirement was not added to CERCLA until 1986 and the requirement for a five year review was not included in the National Contingency Plan until 1990.  Dkt. # 533, at 3.

The EPA started an RI in January 1997 and an FS in February 1997 of possible remedies for lead contamination within residential areas.  The soil removal action was officially designated as Operable Unit 2 ("OU2") and was converted from a removal action into a remedial action.[5]  In August 1997, the EPA issued a ROD for OU2 choosing soil removal and backfilling of residential yards as a permanent remedy.  The EPA states that it was still concerned about elevated blood lead levels in local children, and considered soil remediation as a higher priority than chat pile removal at that time. Dkt. # 484, Ex. 1, at 51-52.   The Army Corps of Engineers performed remedial work for OU2 from January 1998 to July 2000, and the EPA states that over 1,300 residential yards were remediated.  Following July 2000, remedial work continued for OU2 but the government hired private contractors to perform the work.

Following the adoption of the ROD for OU2, the EPA claims that it initiated additional testing of air quality and mining waste within Tar Creek.  The EPA claims that, in September 1998, it conducted air sampling at the request of the Tribe.  Id. at 53.  The EPA claims that it provided funding to the Tribe for an RI/FS to conduct sediment and water sampling in Beaver Creek beginning in 1999.[6]  In March 1999, the State of Oklahoma asked the EPA for funding to test chat piles and the EPA agreed to provide funding to the governor's task force on Tar Creek for the

---

[5]     A removal action "costs less, takes less time, and is geared to address an immediate release or threat of release."  Colorado v. Sunoco, Inc., 337 F.3d 1233, 1240 (10th Cir. 2003).  In contrast,  a remedial action "seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health."  Id.

[6]     The Tribe disputes the EPA's assertion that it funded an RI/FS for Beaver Creek.  Contrary to the EPA's assertion, the Tribe claims that the EPA funded a work plan for Beaver Creek but withdrew funding after the work plan was drafted.  Dkt. # 505, at 9.

proposed testing.  None of this testing led to the immediate issuance an RI/FS or the creation of an operable unit.

On March 23, 1999, the Tribe notified the EPA that it had discovered drums of mining chemicals in an abandoned building.  Initially, the Tribe intended to remove the drums with the help of the Bureau of Indian Affairs ("BIA").  However, the BIA lacked the funding and expertise to complete the removal and asked the EPA to take over on October 31, 1999.  The EPA agreed and, between March 28 and May 23, 2000, the EPA conducted a time-critical removal of the drums.  This removal was designated as Operable Unit 3 ("OU3").

The EPA asserts that, after OU3 was completed, it conducted additional testing and sampling of different aspects of Tar Creek.  The EPA claims that, in 2001, it performed flood plain sampling between Commerce and Miami, Oklahoma.[7]  From 2003 to 2005, the Tribe conducted air monitoring for lead and other pollutants with funding under the Clean Air Act, 42 U.S.C. § 7410.  Dkt. # 505, Ex. 22, at 1.  The EPA claims that it provided funding for the testing and the Tribe agreed to share its results with the community.  The Oklahoma Department of Environmental Quality ("ODEQ") also collected fish tissue samples during 2003 with assistance from the United States Fish and Wildlife Service, but it is not clear if the EPA participated in this sampling.  As a result of the fish tissue sampling, the ODEQ issued an advisory suggesting that people limit the consumption of fish from ponds and creeks within Tar Creek to six eight-ounce meals per month.  Id., Ex. 15, at 3.

On December 9, 2003, the EPA, the Department of the Interior, and two potentially responsible parties ("PRPs") agreed to an Administrative Order on Consent requiring the PRPs, two

---

[7]     The Tribe disputes this factual assertion because there is no documentary evidence showing that such testing occurred.

mining companies, to conduct an RI/FS concerning dangers posed by the chat piles and mining waste in non-residential areas within Tar Creek. This project was called Operable Unit 4 ("OU4"), and the purpose of OU4 was to "address[] the rural and urban areas of the site where mine and mill residues and smelter wastes have been placed, deposited, stored, disposed of, or otherwise come to be located as a result of mining, milling, smelting or related operations." Dkt. # 484, Ex. 2(b), at 4. The PRPs completed the RI and the EPA issued an FS for OU4 in December 2006. Dkt. # 507, Ex. 16. After the FS was issued, Congress passed the Water Resources Development Act of 2007, Public Law 110-114, 121Stat. 1041 ("WRDA"). In part, the WRDA required the EPA to consider relocating residents living within Tar Creek and it provided $30 million to fund the relocation. The EPA modified the FS to comply with WRDA and it issued the ROD for OU4 on February 22, 2008. The EPA has recommended relocation for residents facing the greatest risk of exposure and estimates that work on OU4 will be completed in 30 years.

The EPA claims that it is currently conducting RI/FS activities for an Operable Unit 5 (OU5), which EPA anticipates will address remaining metals in sediments in the Spring River and Neosho River basins. Dkt. # 484, Ex. 1, at 112. However, the EPA has not formally created OU5, and the OU5 investigation is still in its preliminary stages. The EPA acknowledges that the scope of a potential OU5 is likely to change as the EPA gathers more information. The EPA conducted sampling of the Spring and Neosho Rivers in May 2006 and the summer of 2007, and asserts it is continuing to sample other areas as part of an ongoing investigation. The EPA states that it also sampling upstream sources in Kansas and Missouri, chat piles, and groundwater within Tar Creek to determine the sources of sediment contamination. The EPA anticipates that the proposed OU5 will be the final operable unit at Tar Creek. Id. at 110-11. However, OU5 is still in the preliminary

stages and a final remedy addressing sediment contamination in the Spring and Neosho River basins has not been selected.

The Tribe describes the EPA's cleanup efforts as "intermittent, delayed, stalled [and] ill-defined and argues that the EPA's efforts could not be described as diligent under any definition of the word "diligent."  Dkt. # 506, at 17.  According to the Tribe, the danger of lead exposure from chat piles and other mining waste has been known since the 1930s and the EPA should have taken action in the early stages of its cleanup to investigate and remedy this hazard.  The Tribe claims that it is undisputed that the EPA did not begin remediating yards until 1996 and it took over two decades for the EPA to begin an investigation of the hazards posed by chat piles and tailings ponds. The Tribe further criticizes the EPA for not issuing its first Five Year Review until 1994, almost 13 years after Tar Creek was designated as a Superfund site.  The EPA responds that Tar Creek is a complex Superfund site with multiple operable units and it has actively and consistently worked to remediate environmental hazards at Tar Creek.

Procedural History

Plaintiffs filed this lawsuit on December 10, 2003 against seven mining companies that operated in the former Tri-State Mining District.  In the original complaint (Dkt. # 1), the Tribe and individual tribal members alleged claims of public nuisance, private nuisance, trespass, unjust enrichment, strict liability, and fraud against the mining companies.  The individual plaintiffs sought to certify a class of all former and current landowners of real property located within the historic boundaries of the former Quapaw reservation.  The original complaint did not seek relief under CERCLA or allege any claim against the federal government or federal employee in his or her

official capacity.[8]  However, paragraph two of the complaint stated that the Tribe intended to file a CERCLA claim against the United States and other defendants once the 60 day notice requirement of CERCLA had been satisfied.  Dkt. # 1, at 2.  After the statutory notice period expired, plaintiffs requested leave to file an amended complaint adding a CERCLA claim.  Dkt. # 138.  The Court granted plaintiffs' motion and they filed a first amended complaint on May 5, 2004.

The first amended complaint (Dkt. # 146) alleged the same common claims as the original complaint but added claims under CERCLA and the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA").  In its capacity as a natural resources trustee, the Tribe sought damages for "loss of use and costs of restoration, resulting from injury to, destruction of, or loss of natural resources for which the Tribal Chairman of the Quapaw is the trustee" and "all reasonable costs of assessing such injury or damages."  Dkt. # 146, at 77.  Although the Tribe requested damages for lost use, the principal part of the Tribe's request for damages under CERCLA was restoration or replacement damages.  Under RCRA, the Tribe requested a declaratory judgment stating that the mining defendants improperly stored hazardous substances on Tribal land and an order requiring the mining defendants to remove the hazardous substances.  Id. at 78-79.

ASARCO, Incorporated, Childress Royalty Company, The Doe Run Resources Corporation, and NL Industries, Inc., filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) asserting, inter alia, that the Tribe's CERCLA claim was premature because the EPA was actively conducing an RI/FS at Tar Creek.  Dkt. # 152.  The Court ordered the parties to submit supplemental briefing on this

---

[8]     However, Gold Fields Mining Co. and Blue Tee Corp. filed third-party claims against the United States for contribution or indemnification, because the federal government allegedly regulated mining activity on trust land in the former Quapaw reservation.  Dkt. # 47.

argument.  The Tribe argued that the EPA was not diligently proceeding with selection of an RI/FS addressing harm to the natural resources within Tar Creek and the Tribe's CERCLA claim was not premature.  The mining defendants responded the Tribe failed to allege the EPA's lack of diligence and, as a pleading matter, the CERCLA claim stated in the first amended complaint was time-barred. They also argued that the EPA was proceeding with four operable units at Tar Creek and the Tribe's claim for natural resource damages was barred until the EPA selected a final remedy for Tar Creek. While this issue was pending, the Tribe filed an interlocutory appeal of a separate order denying the Tribe's motion to dismiss the mining defendant's counterclaims for recoupment on the basis of sovereign immunity, and the Court stayed the entire case during the appeal.  Dkt. # 248.

The Tenth Circuit issued a decision on April 24, 2006 denying the Tribe's appeal, but this Court continued the stay to permit the parties to continue settlement negotiations.  Dkt. ## 307, 310. On March 16, 2007, the Tribe filed an unopposed motion requesting leave to file a second amended complaint.  In relevant part, the Tribe requested permission to amend its complaint to "conform the [Tribe's] current claims for natural resource damages to the ruling in a recent Tenth Circuit case . . . ."  Dkt. # 320, at 2.  The Court granted the motion and the Tribe filed its second amended complaint (Dkt. # 330) on April 20, 2007.[9]  In the second amended complaint, the Tribe limited its CERCLA claim to damages for "past and interim loss-of-use natural resource damages on behalf of the [Tribe] from the time of release of any hazardous substance until restoration and reasonable cost of assessing injury to the natural resources . . . ."  Dkt. # 330, at 61.  The second amended

---

[9]     The Court found defendant's motion to dismiss (Dkt. # 152) moot based on the filing of plaintiff's  second amended complaint, and defendants' objection to the Tribe's CERCLA claim was not resolved.  Dkt. # 331.

complaint contained a series of footnotes addressing the legal limitations on the Tribe's ability to bring a CERCLA claim before the EPA selected a final remedy.  In one footnote, the Tribe stated:

> Consistent with 42 U.S.C. §§ 9607, 9613(h) and <u>State of New Mexico v. General Electric</u>, 467 F.3d 1223, 1249-51 (10th Cir. 2006), the Quapaw Tribe preserves until after selection of the remedial action its claim under 42 U.S.C. § 9607 for restoration or replacement of natural resources (including groundwater, surface water, sediments, wetlands, surface land, vegetation and wildlife) that will remain contaminated with hazardous substances.  Plaintiffs also preserve their contention that EPA is not diligently proceeding with a remedial investigation and feasibility study under section 9604(b) of CERCLA.

<u>Id</u>. at 61 n.7.  The mining defendants did not renew their argument concerning the ripeness of the Tribe's CERCLA claim.

On June 1, 2007, the Tribe requested leave to file a third amended complaint adding Burlington Northern Sante Fe Railway Co. as a party to the CERCLA claim, because the statutory notice period had expired as to this defendant.  Defendants did not oppose the motion to amend and the motion was granted.  The Tribe filed its third amended complaint (Dkt. # 367) on June 7, 2007.  The federal defendants filed a motion for judgment on the pleading under Fed. R. Civ. P. 12(c) asserting that the Tribe's CERCLA claim was premature.  Dkt. # 427.  In response, the Tribe argued that it had limited its CERCLA claim to interim and lost use damages and this type of claim was not subject to the time limitation imposed by § 9613(g).  The Tribe also argued that the EPA was not diligently proceeding with selection of a final remedy for Tar Creek and requested leave to file a fourth amended complaint alleging the EPA's lack of statutory diligence.  The Court granted the Tribe's motion to amend and the Tribe filed a fourth amended complaint (Dkt. # 449) alleging that the EPA was not diligently proceeding at Tar Creek.

The Tribe's allegation concerning the EPA's lack of diligence undermined much of the federal defendants' motion for judgment on the pleadings.  The parties proposed that the Court allow

the federal defendants and the Tribe to submit cross-motions for summary judgment on the issue of the EPA's diligence under § 9613(g).  The cross-motions for summary judgment have been fully briefed and they, as well as the federal defendants' motion for judgment on the pleadings, are ripe for review.

## II.

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the same standard of review applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Nelson v. State Farm Mut. Auto Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005).  Thus, a court must "accept all the well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party."  Id. (internal quotation marks and citation omitted); Ramirez v. Dept. of Corr., State of Colo., 222 F.3d 1238, 1241 (10th Cir. 2000).  To survive judgment, a "complaint must contain enough facts to state a claim to relief that is plausible on its face."  Anderson v. Suiters, 499 F.3d 1228, 1232 (10th Cir. 2007) (internal quotation marks and citation omitted).  "Judgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"  Park Univ. Enters., Inc. v. Am. Cas. Co., 442 F.3d 1239, 1244 (10th Cir. 2006) (quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  Fed. R. Civ. P. 12(d) further provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Hence, under Rule 12(c), a court should consider only matters in the pleadings or incorporated by reference in, or attached to, the answer or complaint.

Park Univ. Enters., Inc., 442 F.3d at 1244; GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384-85 (10th Cir. 1997).

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327. When the Court is considering cross-motions for summary judgment, each motion must be treated separately and the denial of one motion does not require the Court to grant another. Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

## III.

The Tribe argues that it may proceed with a claim for interim and lost use damages under CERCLA even though the EPA has not selected a final remedy for Tar Creek. It claims that "[u]nder any meaningful construction of 'diligently proceeding,' no reasonable jury could find that EPA has been diligently proceeding with an RI/FS" at Tar Creek and they ask the Court to apply a dictionary definition of "diligent" when construing the relevant statutory term. Dkt. # 506, at 2. The federal defendants respond that the EPA has designated five operable units at Tar Creek and work

14

at the most recent operable unit, OU5, is in the preliminary stages.  They argue that permitting the Tribe to proceed with a CERCLA claim at this time would undermine the EPA's efforts at Tar Creek and would be contrary to the express time limitation in § 9613(g) of CERCLA prohibiting a claim for natural resource damages until a final remedy has been selected.

## A.

CERCLA is a comprehensive federal regulatory scheme that provides a regulatory process for cleaning up hazardous waste sites with the goal of restoring the environment.  New Mexico v. General Electric Co., 467 F.3d 1223, 1244 (10th Cir. 2006).  The Supreme Court has stated that CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites.  Sections 104 and 106 provide the framework for federal abatement and enforcement actions that the President, the EPA as his delegated agent, or the Attorney General initiates."  Key Tronic Corp. v. United States, 511 U.S. 809, 814 (1994).  CERCLA provides the EPA authority to investigate potential environmental hazards and impose the costs of cleanup on all PRPs.  United States v. Bestfoods, 524 U.S. 51 (1998).  The statutory scheme leaves no doubt that the EPA is responsible for investigating and authorizing remedial actions under CERCLA.  Id. at § 9604(a)(4) ("The President shall select remedial actions to carry out this section in accordance with section 9621 of this title").

In relevant part, CERCLA allows the United States, any state, or an Indian tribe, to bring a claim to recover for injury to or destruction of natural resources.  CERCLA provides:

In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) of this section liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State and to any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources are subject to a trust

15

restriction on alienation: Provided, however, That no liability to the United States or State or Indian tribe shall be imposed under subparagraph (C) of subsection (a) of this section, where the party sought to be charged has demonstrated that the damages to natural resources complained of were specifically identified as an irreversible and irretrievable commitment of natural resources in an environmental impact statement, or other comparable environment analysis, and the decision to grant a permit or license authorizes such commitment of natural resources, and the facility or project was otherwise operating within the terms of its permit or license, so long as, in the case of damages to an Indian tribe occurring pursuant to a Federal permit or license, the issuance of that permit or license was not inconsistent with the fiduciary duty of the United States with respect to such Indian tribe. The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages. Sums recovered by the United States Government as trustee under this subsection shall be retained by the trustee, without further appropriation, for use only to restore, replace, or acquire the equivalent of such natural resources. Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action under subparagraph (C) of subsection (a) of this section shall not be limited by the sums which can be used to restore or replace such resources. There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource.

42 U.S.C. § 9607(f)(1).  However, CERLCA limits when claims for NRD may be brought:

Except as provided in paragraphs (3) and (4), no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:

(A) The date of the discovery of the loss and its connection with the release in question.

(B) The date on which regulations are promulgated under section 9651(c) of this title.

With respect to any facility listed on the National Priorities List (NPL), any Federal facility identified under section 9620 of this title (relating to Federal facilities), or any vessel or facility at which a remedial action under this chapter is otherwise scheduled, an action for damages under this chapter must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities) in lieu of the dates referred to in subparagraph (A) or (B). In no event may an action for damages under this chapter with respect to such a vessel or facility be commenced (i) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, or (ii) before selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study

under section 9604(b) of this title or section 9620 of this title (relating to Federal facilities).

42 U.S.C. § 9613(g) (emphasis added).

The Tenth Circuit has interpreted § 9607(f)(1) to permit recovery for restoration or replacement of natural resources and for "damages due to interim loss of use." New Mexico, 467 F.3d at 1244. Other courts have also recognized that a trustee may recover natural resource damages for the value of lost use of the damaged resources from the time a hazardous substance is released to the time of restoration. Alaska Sport Fishing Ass'n v. Exxon, Corp., 34 F.3d 769, 772 (9th Cir. 1994); State of Ohio v. United States Dep't of the Interior, 880 F.2d 432, 454 n.34 (D.C. Cir. 1989). However, natural resource damages claims are treated as residual claims, because these claims are ordinarily filed after the EPA has completed its work at a Superfund site. Utah v. Kennecott Corp., 801 F. Supp. 553, 568 (D. Utah 1992) ("customarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup. As a residue of the cleanup action, in effect, they are thus generally not settled prior to a cleanup settlement."). This Court has not found any authority permitting a natural resources trustee to file a natural resource damages claim under CERCLA while remedial work is underway at a Superfund Site.

The Tribe relies on New Mexico as the basis for its argument that it may file a CERCLA claim seeking damages for interim and lost use to natural resources before the EPA has completed its remedial work at Tar Creek. The Tribe argues that natural resource damages claims for interim and lost use damages are not subject to the time limitation of § 9613(g)(1), because this type of claim does not interfere with the EPA's work at a Superfund site. The federal defendants respond that New Mexico discusses remedies available under common law natural resource damages claims

17

in light of CERCLA's remedial scheme, but <u>New Mexico</u> does not exempt claims for interim and lost use natural resource damages from CERCLA's timing provision for natural resource damages claims.

In <u>New Mexico</u>, the attorney general of New Mexico filed two separate lawsuits concerning alleged groundwater contamination of Albuquerque, New Mexico's South Valley.  The EPA began work in South Valley in 1983 and established six operable units at the site.  The State was actively involved with selection of a remedy to clean up groundwater contamination and, as required by CERCLA, the governor appointed a natural resources trustee to represent the state in its dealings with the federal government.  The State legislature passed the Natural Resources Trustee Act in 1993, which created the Office of Natural Resources Trustee ("NRT").  <u>New Mexico</u>, 467 F.3d at 1234.  The NRT was authorized to bring a lawsuit pursuant to federal or state law to recover for harm to the state's natural resources, and the NRT entered tolling agreements with PRPs to negotiate a settlement without waiving any claims.

While the tolling agreements were in effect and before any claims had been filed against PRPs, New Mexico's attorney general retained independent counsel to file two lawsuits seeking unrestricted monetary damages for harm to the State's natural resources.  First, the attorney general filed a lawsuit in federal court alleging a natural resource damages claim under CERCLA.  Second, the attorney general filed a lawsuit in state court alleging claims under New Mexico statutory and common law to recover natural resource damages.  The defendants removed the state court case to federal court and the two cases were consolidated.  After disputing the federal court's subject matter jurisdiction for almost two years, the attorney general moved to dismiss the CERCLA claim with prejudice and to remand the case to state court.  The district court granted the attorney general's

motion to dismiss the CERCLA claim, but decided to exercise supplemental jurisdiction over the remaining claims. Id. at 1237. The district court issued two opinions significantly limiting the scope of the attorney general's substantive claims and barring the attorney general from seeking any remedy inconsistent with CERCLA's remedial scheme. In a third opinion, the district court granted summary judgment in favor of defendants on the attorney general's remaining claims for damages, because the requested damages were unavailable as a matter of law or were not supported by the facts. Id. at 1241-42.

The Tenth Circuit considered the preemptive effect of CERCLA's remedial scheme on the attorney general's state law claims. While CERCLA did not completely preempt the attorney general's claim for natural resource damages under state law, the attorney general's state law claims were preempted to the extent that state law would create an "obstacle to the accomplishment of congressional objectives as encompassed in CERCLA." Id. at 1245. CERCLA permits a natural resources trustee to recover damages for restoration or replacement and also for "damages due to interim or loss of use." Id. In terms of CERCLA's preemptive effect, "CERCLA's comprehensive natural resource damages scheme preempts any state remedy designed to achieve something other than the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource." Id. at 1247.

Based on this construction of CERCLA's remedial scheme, the Tenth Circuit found that the State's common law claims were not completely preempted but the State could not use common law claims to avoid CERCLA's remedial scheme. The Tenth Circuit stated:

> Under the logic of the State's approach, hazardous waste sites need never be cleaned up as long as PRPs are willing or required to tender money damages to a state as trustee. Similarly, PRPs conceivably might be liable for double recovery where a state's successful state law claim for money damages precedes an EPA-ordered

cleanup.  Finally, in a case where an NRD claim is premised upon both CERCLA and state law, a portion of the recovery if earmarked for the state law claims could be used for something other (for example, attorney fees) than to restore or replace the injured resource.  The remainder of the NRD recovery, earmarked for the CERCLA claim, would then be insufficient to restore or replace such resource.  Clearly, permitting the State to use an NRD recovery, which it would hold in trust, for some purpose other than to "restore, replace, or acquire the equivalent of" the injured groundwater would undercut Congress's policy objectives in enacting 42 U.S.C. § 9607(f)(1).

Id. at 1248 (citation omitted).  In New Mexico, the EPA had not completed its work in South Valley. This provided a further limitation on the State's common laws claims, because CERCLA prohibits a natural resources trustee from bringing a claim challenging the EPA's selection of a remedy before work has been completed.  Therefore, the State's claims were limited to any natural resource damages that did not conflict with CERCLA's remedial scheme and did not challenge the EPA's proposed remedy.  Id. at 1249.  After considering the totality of the State's NRD claims, the sole aspect of the State's lawsuit that was not preempted under CERCLA was the State's request for loss of use damages under state law.  However, the evidence showed that the State had actually acquired the equivalent of the lost natural resources through a different water source, and the district court properly granted summary judgment to defendants on this issue.

The Tribe argues that New Mexico permits a natural resources trustee to file a CERCLA claim for lost use damages before remedial work is completed but to preserve a primary CERCLA claim until the EPA has selected a final remedy.  See Dkt. # 438, at 4 ("In contrast to the 'residual injury,' the 'loss of services' injury is unaffected by, and unrelated to, EPA's selection of the remedial action or its work on the [RI/FS]").  In New Mexico, the Tenth Circuit did not hold that a natural resources trustee can bring a CERCLA claim for interim or lost use of natural resources and, following completion of remedial work, file a second lawsuit to recover restoration or

20

replacement damages.  New Mexico discusses the type of damages available under CERCLA and the effect of CERCLA's remedial scheme on similar state law claims.  However, the plaintiff in New Mexico voluntarily dismissed its CERCLA claim, and the Tenth Circuit was not asked to decide whether a plaintiff could divide a CERCLA claim into two separate lawsuits.  The Tribe's interpretation of New Mexico stretches far beyond the issues addressed by the Tenth Circuit and the Court finds that New Mexico does not exempt the Tribe's CERCLA claim for interim and lost use damages from CERCLA's timing provision.

New Mexico shows that the Tribe may use state common law claims to recover natural resource damages to the extent that such damages do not conflict with CERCLA's remedial scheme or challenge the EPA's proposed remedy, but its CERCLA claim for natural resource damages is still a residual claim.[10]  NRD, even interim and lost use damages, can not be fully measured until the EPA's remedial work is completed.  Alaska Sport Fishing Ass'n, 34 F.3d at 772 (NRD are based on the lost use from the time of release to complete restoration of the natural resources).  Even if the Tribe were correct that the EPA's remedial work does not impact a claim for lost use damages, the Tribe has not presented any authority permitting it to split its CERCLA claim into two parts.  This Court has independently researched the issue and can not find any authority supporting the Tribe's position.  Section 9613(g)(1) does not exempt claims for interim and lost use damages from its timing limitation and, therefore, the Tribe's CERCLA claim is premature unless the Tribe's claim is exempt from CERCLA's timing requirements.

---

[10]     At this time, the Court will not address the remedies available to plaintiff under state law in light of the Tenth Circuit's decision in New Mexico.  However, it is clear that New Mexico will impact the availability of NRD for plaintiff's state law claims.

**B.**

Based on the Court's ruling that the Tribe's NRD claim for interim and lost use damages is not exempt from the timing limitation of § 9613(g)(1), the Court must consider the Tribe's argument that it can proceed with its CERCLA claim due to the EPA's lack of diligence.  The plain language of § 9613(g)(1) prohibits a natural resources trustee from filing a CERCLA claim "before the selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study under section 9604(b)."  The parties agree that the EPA has not selected a final remedy for Tar Creek.  In the fourth amended complaint, the Tribe alleges that the EPA is not diligently proceeding with an RI/FS at Tar Creek and laments the EPA's "uncoordinated, ineffective and piecemeal" efforts to address contamination at  Tar Creek.  Dkt. # 449, at 46.  The primary source of disagreement about the meaning of "diligently proceeding" is the applicable time period which the Court should review.  The Tribe asks the Court to conduct a historical survey of the EPA's efforts at Tar Creek.  However, the federal defendants argue that the Court should consider only the EPA's activities at the time this case was filed and up to the present day when determining the EPA's diligence.

Section 9613(g)(1) bars an NRD claim while the EPA is "diligently proceeding" with an RI/FS at a facility, but it does not define "diligently proceeding."  In this case, the parties do not dispute that the EPA has not selected a final remedy for OU4 and an RI/FS for OU5 is at least in the planning stages.  The federal defendants argue that the Tribe's CERCLA claim is premature, because the EPA is "actively performing tasks that fall within the definition of 40 C.F.R. § 300.5 of remedial investigations and feasibility studies in an effort to select a final site remedy."  Dkt. #

484, at 1.  The Tribe asks the Court to conduct a thorough review of the EPA's activities at Tar

Creek from 1983 to the present to determine whether the EPA has proceeded diligently.

When construing the term "diligently proceeding," this Court's task is "to determine

congressional intent using traditional tools of statutory interpretation."  New Mexico Cattle Growers

Ass'n v. United States Fish and Wildlife Service, 248 F.3d 1277, 1282 (10th Cir. 2001).  The Tenth

Circuit has provided a framework for district courts when interpreting a federal statute:

> When interpreting the language of a statute, the starting point is always the language
> of the statute itself.  If the language is clear and unambiguous, the plain meaning of
> the statute controls.  A statute is ambiguous when it is capable of being understood
> by reasonably well-informed persons in two or more different senses.  If an
> ambiguity is found, a court may seek guidance from Congress's intent, a task aided
> by reviewing the legislative history.  A court can also resolve ambiguities by looking
> at the purpose behind the statute.

United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 710 (10th

Cir. 2006) (internal citations omitted).  In some cases, the Tenth Circuit has referred to a dictionary

definition to determine if the meaning of a statutory term is clear or ambiguous.  United States v.

Montgomery, 468 F.3d 715, 720 (10th Cir. 2006).  However, statutory language must not be

considered in isolation and the court must also consider the "language and design of the statute as

a whole."  McCarthy v. Bronson, 500 U.S. 136, 139 (1991).

As a starting point, the Court notes that the federal defendants are correct that § 9613(g)(1)

is written in the present tense and requires the Court to consider whether the EPA "is diligently

proceeding with a remedial investigation and feasibility study."  While this does not conclusively

prohibit the Court from considering the EPA's past conduct, it strongly emphasizes the importance

of the EPA's ongoing activities as a factor in the Court's decision.  The Tribe relies on a dictionary

definition of "diligently" to establish a common meaning of the statutory language.  Webster's

Dictionary defines "diligent" as "characterized by steady, earnest, attentive and energetic application." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 633 (1981). However, the Tribe's reference to a dictionary definition does not provide any guidance on the scope of this Court's review of the EPA's activities at Tar Creek. The issue before the Court is not the common meaning of the word diligent, and defendants are not disputing the dictionary definition. Instead, the parties are disputing whether this Court's review should encompass the EPA's entire history at Tar Creek or simply the EPA's actions after this case was filed. The plain language of the statute implies that the Court's review is limited to the EPA's current and ongoing work at a Superfund site. However, the scope of judicial review is not clearly addressed in CERCLA and, in that sense, the statutory language is ambiguous.

The Tribe cites RCRA as a similar statute using the language "diligently proceeding" and argues that RCRA permits a court to look at the pace of remedial action before a lawsuit was filed. 42 U.S.C. § 6972. RCRA allows any person to "commence a civil action against any person . . . to enforce 'any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to RCRA." United States v. Colorado, 990 F.2d 1565, 1577 (10th Cir. 1993). RCRA citizen suits can be filed prior to the completion of a CERCLA response action but RCRA suits are prohibited if a RCRA enforcement action is underway. Id. at 1577-78. Using language similar to CERCLA, RCRA prohibits a citizen suit if the EPA has "commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of [CERCLA]." 42 U.S.C. § 6972(b)(2). The primary purpose of a RCRA citizen suit "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the

environment." Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996) (emphasis added).  Unlike

CERCLA, RCRA is "not principally designed to effectuate the cleanup of toxic waste sites or to

compensate those who have attended to the remediation of environmental hazards." Id.  While a

CERCLA removal action is meant to address the existence of a past release of hazardous substances,

RCRA is forward looking and permits a citizen to bring a suit concerning the present and future

release of hazardous substances.   Aside from the distinctly different purposes of RCRA and

CERCLA claims, the Court notes that RCRA does not define "diligently proceeding" and federal

district courts have come to different conclusions about the proper interpretation of "diligently

proceeding" under RCRA. See generally City of Bangor v. Citizens Communications Co., 2004 WL

1572612, at *6 (D. Me. July 6, 2004); City of Heath, Ohio v. Ashland Oil, Inc., 834 F. Supp. 971

(S.D. Ohio 1993); Acme Printing Inc. Co. v. Menard, Inc., 812 F. Supp. 1498 (E.D. Wis. 1992);

Merry v. Westinghouse Elec. Corp., 697 F. Supp. 180 (M.D. Pa. 1988).  Therefore, it makes little

sense for this Court to refer RCRA's use of the words "diligently proceeding" when this language

is equally undefined in both RCRA and CERCLA.[11]

    While the ordinary meaning of the words "diligently proceeding" is clear, congressional

intent concerning the scope of the Court's review is ambiguous.  The federal defendants ask the

Court to adopt a definition of "diligently proceeding"  that would "bar natural resource damage

claims before final remedy selection when EPA is actively performing tasks that fall within the

---

[11]    This Court agrees with Paper Recycling, Inc. v. Amoco Oil Co., 856 F. Supp. 671 (N.D. Ga.
1993), which stated that RCRA suits ensure "a cleaner and healthier environment" and such
suits should sometimes be permitted even when the state or federal government has initiated
some, but not complete, remedial action for an environmental hazard. Id. at 676.  Regardless
of whether the Tribe is permitted to proceed with an NRD claim at this time, Tar Creek will
remain in the same condition and the same immediacy for permitting the Tribe's claim is not
present.

definitions in 40 C.F.R. § 300.5 of remedial investigations and feasibility studies, in a <u>bona</u> <u>fide</u> effort to select a final remedy for the site."  Dkt. # 484, at 22. They cite § 9613(h), which states:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title . . . .

42 U.S.C. § 9613(h).  The federal defendants treat this section as a "broad jurisdictional bar" and argue that this evidences congressional intent to prohibit CERCLA claims that directly or indirectly challenge the EPA's current activities.  According to the federal defendants, the residual nature of NRD claims suggests that courts should be hesitant to review the EPA's past conduct, because the need for NRD may be limited or eliminated through the EPA's remedial action.  <u>See</u> Natural Resource Damages Assessments, 51 Fed. Reg. 27674 (Aug. 1, 1986) ("This rule provides that natural resource damages are for injuries residual to those injuries that may be ameliorated in the response action. . . .This concept of natural resource damages as a residual should prevent the development of two separate actions to ameliorate the same situation, encourage the inclusion of natural resource concerns in the development of remedial plans, and preserve the priority order of remedial actions intended by the creation of the [NPL].").

The federal defendants also cite the legislative history of § 9613(g) to support their position. The House Judiciary Committee studied proposed amendments to CERCLA in 1985 and discussed changes to the statute of limitations for NRD claims:

> The amendment ensures that actions for natural resource damages are filed at the most appropriate time for the particular site involved.  Because a remedial action at the site may include restoration, rehabilitation, or replacement of natural resources, an action for natural resource damages for a site on the [NPL] should not take place before the remedy has been selected.

H.R. REP. NO. 99-253(III), at 21 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3043.  In another

report, the House Committee on Merchant Marine and Fisheries explained the purpose of NRD

claims and amendments to the statute of limitations:

> Actions to recover for damage to natural resources may depend upon the type of
> remedial action undertaken at a particular site, because the specifics of the remedial
> action may determine the extent of damage to natural resources that will remain at
> the site.  If the remedial action takes care of most of the natural resource damage at
> the site, then a separate action for damages may not be necessary.  Conversely, if at
> the conclusion of the remedial action substantial damage remains, then action to
> recover damages may be warranted.  Since the judgment of the necessity for
> pursuing a damages action must necessarily await the final decision on the remedial
> action, it is best to ensure that the statute of limitations for bringing such damages
> actions does not force a premature decision.

H.R. REP. NO. 99-253(IV), at 53-54 (1985), reprinted in 1986 U.S.C.C.A.N. 3068, 3083-84.  The

amendments to CERCLA were sent to a conference committee to resolve differences between the

House and Senate versions, and the conference committee specifically addressed the meaning of

"diligently proceeding":

> [Section 113(g)] further requires that civil actions for damages to natural resources
> generally be delayed until completion of the RI/FS at NPL sites and at certain other
> sites where the President is diligently proceeding with the RI/FS.  The phrase "the
> President is diligently proceeding with a remedial investigation and feasibility study"
> includes cases where a potentially responsible party is performing an RI/FS under
> supervision of the President.

H.R. CONF. REP. NO. 99-962, at 223, reprinted in 1986 U.S.C.C.A.N. 3276, 3315-16.

The Tribe argues that the legislative history is inapplicable, because it has limited its

CERCLA claim to damages for interim and lost use of natural resources.  However, this Court has

determined that the Tribe's attempt to limit its CERCLA claim to interim and lost use damages does

not exempt the Tribe's claim from CERCLA's timing provisions.  The Tribe also argues that

legislative history should not be considered, because the meaning of the phrase "diligently

proceeding" is clear and unambiguous.  As noted above, the meaning of "diligently proceeding" may

be clear in a linguistic sense but a simple dictionary definition does not provide sufficient guidance

when interpreting the statutory language in the context of the overall statutory scheme.  In this

instance, the Court finds that consideration of legislative history is appropriate and helpful when

construing the relevant statutory language.  Wyoming v. United States, 2790 F.3d 1214, 1230 (10th

Cir. 2002) (To construe a statute, a court must "examine 'the purpose, structure, and legislative

history of the entire statute.'"); Nicholas v. Denver & R. G. W. R. Co., 195 F.2d 428 (10th Cir.

1952) ("where there is an ambiguity, recourse may be had to such legislative history as an aid in

ascertaining the legislative intent.").

     The parties have identified one case applying § 9613(g), Coeur D'Alene Tribe v. ASARCO,

Inc., 280 F. Supp. 2d 1094 (D. Idaho 2003), but the parties dispute Coeur D'Alene's application to

this case.  In Coeur D'Alene, the United States, the State of Idaho, and the Coeur D'Alene Tribe

filed a CERCLA claim seeking response costs and NRD.  Id. at 1102.  The defendants argued that

the tribe's CERCLA claims were premature under § 9613(g)(1), because the EPA was actively

remediating the Coeur D'Alene Basin.  Id. at 1109.  However, the EPA had not initiated an RI/FS

at the time the lawsuit was filed and this fact was critical to that court's decision.  The court

permitted the plaintiffs to proceed with a CERCLA claim and stated:

> In this case, at the time the lawsuit for natural resource damages was filed, EPA had
> not made the decision to begin the RI/FS process on the Basin.  Accordingly, it
> would be improper to allow Defendants to use § 9613 as a shield against the natural
> resource damage claims that were properly filed.  Further, as admitted to by the
> Defendants, the claims for response costs are properly before the Court.

Id.  The Coeur D'Alene court was not required to construe the terms "diligently proceeding"

because, at the time the case was filed, the undisputed evidence showed that the EPA was not

proceeding at all.  In this case, the parties agree that the EPA is working at Tar Creek but dispute the EPA's diligence.  Coeur D'Alene stands for the proposition that a natural resource trustee may proceed with an NRD claim under CERCLA if the EPA was not conducting an RI/FS at the time the claim was filed.  However, as the parties do not dispute that an RI/FS was underway at the time the Tribe's CERCLA claim was filed, Couer D'Alene is inapplicable to the present case.

Considering the plain meaning of the statutory language, the statutory scheme as a whole, and the legislative history, the Court finds that the meaning of "diligently proceeding" offered by both parties is unreasonable and Congress intended something in between the extremes suggested by the parties.  The federal defendants would read the word "diligently" out of the statute and would have the Court bar any NRD claim if the EPA is conducting any activity that might be part of an RI/FS.  However, the Tribe's position that Congress intended a court to conduct a de novo review of the EPA's entire history at a Superfund site, including the EPA's alleged knowledge of a hazard before CERCLA was enacted, is equally unconvincing.  The Court can not ignore the general rule that courts should defer to an administrative agency's expertise in a particular area and its construction of ambiguous statutory language.  See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Therefore, some deference to the EPA's interpretation of § 9613(g)(1) and  its decisions to prioritize certain types of cleanup activities at Tar Creek is appropriate.

The relevant statutory language prevents a natural resources trustee from pursuing an NRD claim "before the selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study." 42 U.S.C. § 9613(g)(1).  The statute is written in the present tense and the plain language of the statute directs a court to review the EPA's activities at

the time a claim is filed.  The general rule under the statute is that an NRD claim should be filed within 3 years "after the completion of the remedial action."  Id.  CERCLA also deprives a federal court of jurisdiction to hear a challenge to the EPA's selected remedy while the remedial action is underway.  Id. at § 9613(h).  An NRD claim, including a claim for interim and lost use damages, is a residual claim and the full measure of damage can not be determined until a remedial action is completed.  See supra, at III(A).  The legislative history of CERCLA supports this view of NRD claims as residual and suggests that a court's construction of "diligently proceeding" should be focused on present, rather than past, activities at a site.  H.R. CONF. REP. NO. 99-962, at 223, reprinted in 1986 U.S.C.C.A.N. 3276, 3315-16 ("The phrase 'the President is diligently proceeding with a remedial investigation and feasibility study' includes cases where a potentially responsible party is performing an RI/FS under supervision of the President.").  All of these factors counsel against adopting an interpretation of "diligently proceeding" that would permit a court to engage in an extensive review of the EPA's past conduct at a particular site.

Aside from a dictionary definition of "diligent," the Tribe has offered little support for its assertion that the Court should conduct a searching review of the EPA's entire history at Tar Creek. The Court agrees with the Tribe that the word "diligently" necessarily implies some amount of historical review, because it would be difficult to assess the EPA's present diligence without some discussion of the past.  However, the Tribe's fact-intensive argument demonstrates the difficulty that would be presented if courts were required to examine the entire pre-suit history of a Superfund site and weigh this as a deciding factor when determining the EPA's diligence.  The Tribe's argument often turns into a critique of the effectiveness of the EPA's actions and essentially asks the Court to substitute its judgment for that of the EPA.  CERCLA does not permit courts to make such

30

judgments.  See 42 U.S.C. § 9613(h); New Mexico, 467 F.3d at 1249;  United States v. City and County of Denver, 100 F.3d 1509, 1513-14 (10th Cir. 1996).  While a limited review of the EPA's pre-suit activities may permissible, the Court finds that Congress intended for courts to focus on the EPA's present activities to determine if the EPA is diligently proceeding under § 9613(g)(1).  A court should consider the EPA's activities at the time the lawsuit was filed and the EPA's current activities when reviewing the EPA's diligence.  In addition, the statutory scheme shows a preference for deferring NRD claims until the completion of remedial work.

Applying this interpretation of the term "diligently proceeding" to the facts of this case, the Court must determine whether the EPA was diligently proceeding with an RI/FS at Tar Creek at the time this lawsuit was filed.  The Tribe filed its CERCLA claim on May 5, 2004 in its first amended complaint.  At the time, the EPA had formally initiated an RI/FS for OU4 to remediate chat piles and other mining waste within Tar Creek.  The RI/FS was completed in December 2006 and the EPA issued a ROD on February 22, 2008.  This shows that the EPA was actively conducting at least one RI/FS when the lawsuit was filed and it has actively worked to select a remedy for the hazard posed by chat piles and mining waste.  The Tribe focuses on the EPA's decision not to prioritize removal of chat piles over other remedial actions because, the Tribe alleges, the health risks caused by mining waste were known long before Tar Creek was placed on the NPL.  Dkt. # 506, at 7-8.  The EPA has provided evidence that it did not consider chat piles to be an immediate health risk to local residents and, although the Tribe may disagree with the EPA's assessment, such challenges to EPA's selected remedial action are not appropriate at this time.  See 42 U.S.C. § 9613(h).  After the RI/FS for OU4 was finished, the EPA obtained $30 million in funding under WRDA to relocate residents living within Tar Creek and relocation was incorporated into the selected remedy for OU4.

Dkt. # 507, Ex. A, at 9. Although removal of the chat piles may take up to 30 years, the EPA estimates that voluntary relocation of residents should take about three years. Id. at 31. The mere fact that removal of chat piles may take 30 years does not imply a lack of diligence on the EPA's part, especially since the EPA has decided to prioritize relocation of residents over removal of debris. The undisputed evidence shows that the EPA was proceeding with an RI/FS for OU4 at the time this case was filed and it diligently worked toward selecting a final remedy for removal of chat piles and relocation of local residents.

In addition, there is evidence that the EPA is proceeding with OU5, even though OU5 may still be in the preliminary stages of an RI. The Tribe argues that OU5 is in its earliest stages and it is so undefined that it should not be considered by the Court when considering the EPA's statutory diligence. Dkt. # 506, at 14. On January 11, 2008, an EPA representative testified in his deposition that the EPA began sampling the Spring and Neosho Rivers for sediment contamination in May 2006. Dkt. # 507, Ex. 3, at 25; see also Dkt. # 533, Ex. 3(d), at 2 (noting that the EPA tested samples from the Spring and Neosho Rivers in May 2006 and a second phase of sampling was scheduled for 2007). He acknowledged that the EPA had not officially designated OU5 in any way or started a formal RI. Dkt. # 507, Ex. 3, at 25. The EPA responds that some steps that could be part of an RI for OU5 have occurred, but substantial work on OU5 must wait until upstream sources of contamination from a separate Superfund site have been addressed. Dkt. # 533, at 7-8. According to the ROD for OU4, "OU5 is currently in the early site characterization phase." Dkt. # 507, Ex. 1, at 12. There is room for debate about the status of OU5, but the EPA has produced evidence that some work on OU5 has started. While it is unclear if OU5 could independently support a finding that the EPA is diligently proceeding with an RI/FS, the EPA can rely on the

designation of OU5 as an operable unit and work already completed to support its argument that it is diligently proceeding.

The Court has also considered the EPA's past conduct at Tar Creek, although it does not give this evidence significant weight in its decision. In 1984, the EPA created OU1 to address contamination of groundwater and surface water and work on OU1 was completed in 1986. The EPA did not immediately identify chat piles or tailings ponds as a health risk to local residents, but Indian Health Service sent the EPA a letter stating that 34 percent of local children had blood lead levels exceeding the CDC's minimum level of concern. After the EPA received this letter, it initiated a time-sensitive soil removal action and it conducted further studies of the sources of lead contamination in Tar Creek. The soil removal action was designated as OU2 in 1997 and the EPA actively removed soil from schools, playgrounds, day care centers and residences over the next few years. The Tribe states that EPA's window to diligently proceed closed long before the Tribe filed its lawsuit, because the EPA failed to remove, or even sample, chat piles from the time Tar Creek was placed on the NPL. According to the Tribe, the EPA "started the race asleep at the wheel" and "awoke from its slumber" only after Indian Health Service alerted the EPA to a health risk. Dkt. # 506, at 25. However, the evidence shows that the EPA did not ignore this evidence; it simply assessed the risk posed by chat piles and mining waste differently than the Tribe. Although chat piles and mining waste may seem like an obvious health hazard from the Tribe's perspective, the EPA made a conscious decision to prioritize cleanup of other hazards. This Court is not in a position to second-guess the EPA's choices.

Based on the evidence presented, it is clear that the EPA was diligently conducting remedial action at Tar Creek when this case was filed and work at Tar Creek is continuing. Even if the Court

were to give more weight to the EPA's past conduct, the Court does not find the EPA's past actions reflect a lack of diligence.  Rather, the evidence shows that the EPA did not find evidence of an imminent health risk to area residents from chat piles, but it quickly initiated response actions once risks were identified.  The Tribe provides evidence dating back to the 1930s and 1940s recognizing the risks of lead exposure, but this evidence addresses the risks of lead exposure in general terms and does not assist the Court when examining the EPA's diligence at Tar Creek.  Tar Creek presented a wide range of environmental hazards, including soil and water contamination, improperly stored mining waste, and harm to humans and wildlife.  If the Court were to conclude that the EPA has not proceeded diligently, the Court would essentially be substituting its judgment for the EPA's, and CERCLA shows an express congressional intent to defer to the EPA's decisions concerning cleanup and removal of hazardous substances.  Therefore, the Court finds that the EPA has established that it has proceeded diligently at Tar Creek and the Tribe's claim for natural resource damages is premature.

## C.

The Tribe asserts that it may proceed with a claim for assessment costs and obtain a declaratory judgment binding in any future action against defendants for assessment costs, because costs are not treated as damages under § 9613(g)(1).  The federal defendants argue that the Tribe's claim for costs is indistinguishable from its claim for damages and § 9613(g)(1) prevents the Tribe from pursuing any part of its NRD claim if its CERCLA claim is premature.

Section 9607(a)(4)(C) permits an appropriate party to collect "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction or loss resulting from such a release . . . ."  The same statutory section that creates an

NRD claim appears to include assessment costs as an element of NRD, and this implies that assessment costs are simply part of an NRD claim.  The federal defendants point out that the statute authorizes a single NRD claim, which appears to include assessment costs as an element.  Dkt. # 445, at 9.  The Tribe argues that CERCLA specifically excludes assessment costs from the definition of damages. Dkt. # 438, at 13.  CERCLA defines damages as "damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title."  42 U.S.C. § 9601(6).  Thus, the definition of damages does not expressly include costs as an element of damages and section 9613(g)(1) applies only to an "action for damages."  CERCLA expressly creates three other types of cost recovery claims, but those claims are exclusively for costs and are governed by a different timing provision.  See 42 U.S.C. § 9613(g)(2) (statute of limitations for cost recovery claims).  Cost recovery claims against PRPs to recover costs associated with removal or remedial actions may be filed "at any time after such costs have been incurred."  Id.  However, this section does not expressly address assessment costs for NRD claims.

The Tribe cites Confederated Tribes and Bands of the Yakama Nation v. United States of America, 2007 WL 2570437 (E.D. Wa. Sept. 4, 2007), to support its argument that a claim for assessment costs can proceed even if an NRD claim is premature.  In that case, the Yakama Nation sought, inter alia, a declaratory judgment "declaring Defendants to be liable to the Yakama Nation for all past and future natural resource injury assessment costs . . . ."  Id. at *1.  The court distinguished NRD from assessment costs and determined that a natural resources trustee may bring a separate action for costs even if the EPA is diligently proceeding with remedial action.[12]  Id. at *5

---

[12]    Yakama Nation does not address whether a plaintiff could proceed with a claim for NRD before the selection of a remedy, because the NRD claim was stayed.  Id. at *6.

("an action for the recovery of injury assessment costs under § 9607(a)(4)(C) is ripe when such costs are incurred").  The Yakama Nation had already expended significant funds to assess the extent of its NRD, and it was permitted to proceed with its claim seeking a declaratory judgment for costs already incurred.  Id. at *5.  Therefore, the court permitted the Yakama Nation to proceed with a claim for declaratory relief to recover assessment costs that had already been incurred.

Even if the Court were to apply Yakama Nation, the Court has reviewed the fourth amended complaint and the Tribe has not alleged that it has actually incurred any assessment costs.  Its request for assessment costs is directed to future, rather than past, assessment costs and Yakama Nation does not allow this type of claim.  If the Court were to treat the Tribe's claim for assessment costs as an ordinary cost recovery claim under CERCLA, it would still be barred because the fourth amended complaint fails to allege that any assessment costs have actually been incurred.  Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005) (prima facie case for recovery costs must include allegation that a party has actually incurred response costs).  Therefore, the Tribe's fourth amended complaint states a claim for future assessment costs only, and CERCLA does not permit such claims to proceed before the EPA's work is completed.  42 U.S.C. § 9613(g)(2).

**IT IS THEREFORE ORDERED** that Federal Defendants' Motion for Judgment on the Pleadings (Dkt. # 427) is **granted**; Federal Defendants' Combined Motion for Summary Judgment and Memorandum in Support (Dkt. # 484) is **granted**; and Plaintiffs' Motion for Partial Summary Judgment and Brief in Support (Dkt. # 506) is **denied**.  The Tribe's CERCLA claim (the sixth claim for relief in the fourth amended complaint) is **dismissed without prejudice**.

**IT IS FURTHER ORDERED** that the parties shall submit an amended joint status report and an agreed scheduling order for both phases of the remaining claims **no later than July 23, 2008**. The pending motions requesting new scheduling orders and a scheduling conference (Dkt. ## 527, 540, 543, 553) are **moot**.

**DATED** this 7th day of July, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT