## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

THE QUAPAW TRIBE OF OKLAHOMA,    )
et al.,    )
    )
             Plaintiffs,    )
    )
v.    )    **Case No. 03-CV-0846-CVE-PJC**
    )
BLUE TEE CORP., et al.,    )
    )
             Defendants.    )

## OPINION AND ORDER

Now before the Court are Defendant Burlington Northern Santa Fe Railway Company's Motion for Summary Judgment (Dkt. ## 616, 628) and the Motion for Summary Judgment on Phase I Issues and Brief in Support on Behalf of Defendants Blue Tee Corp., The Doe Run Resources Corporation, Gold Fields Mining, LLC, and NL Industries, Inc. (Dkt. # 618). Defendants collectively assert that the Quapaw Tribe of Oklahoma (the Tribe) lacks standing to pursue any claim on behalf of its members because the claims asserted in the fifth amended complaint and any respective damages belong exclusively to the individual Tribal members. The Tribe responds that it has parens patriae standing to assert claims to protect its quasi-sovereign interest in the health and well-being of Tribal members, without interfering with the rights of its members to pursue their own claims.

## I.

Background

In 1818, the Tribe entered a treaty with the United States "acknowledging themselves to be under the protection of the United States, and of no other state, power, or sovereignty, whatsoever." Treaty with the Quapaw, 1818 art. 1, August 24, 1818, 7 Stat. 176. The United States and the Tribe

entered a new treaty in 1833 in which the Tribe agreed to cede its existing reservation to the United States in exchange for land now located within the State of Oklahoma. Treaty with the Quapaw, 1833, May 13, 1833, 7 Stat. 424. During the Civil War, the Tribe aligned with the Confederacy and temporarily terminated its relationship with the United States. However, the Tribe entered a new treaty in 1865 reestablishing its relationship with the United States. Dkt. # 620, Ex. 2.

As early as 1889, Tribal leaders discussed the possibility of allotting land to individual Tribal members in 200 acre allotments. The Tribe favored 200 acre allotments, instead of the more common 160 acre allotments, because approximately 18,000 acres would be left for settlement by non-Quapaws if each Tribal member received only 160 acres. On March 23, 1893, the Tribe passed a resolution approving 200 acre allotments to each Tribal member. In 1894, the Tribe realized that approximately 12,000 acres were not allotted, and an 40 additional acres were allotted to each Tribal member. Congress passed the Quapaw Allotment Act in 1895 and "ratified and confirmed" the allotments issued to Tribal members. Congress also imposed a 25 year restriction on alienation of land within the former Quapaw Reservation,[1] and subsequent acts of Congress extended the restrictions on alienation until 1971.

In the early twentieth century, lead and zinc were discovered in southeastern Kansas and northeastern Oklahoma. The region became known as the Tri-State Mining District. Most of the large-scale mining operations occurred in the 1920s and 1930s, but some mining operations continued in the region into the 1970s. Defendant Blue Tee Corp. (Blue Tee) was formerly known,

---

[1]      Although the Tribe suggests it still has a reservation, federal law is clear that there are no reservations remaining in Oklahoma. See Osage Nation v. Oklahoma ex rel. Oklahoma Tax Commission, 597 F. Supp. 2d 1250 (N.D. Okla. 2009) (collecting citations establishing that no Indian reservations currently exist within Oklahoma).

inter alia, as American Zinc Company, and plaintiffs allege that Blue Tee or its successor entities engaged in mining activity from 1925 to 1973 in this region.[2]  The Doe Run Resources Corp. (Doe Run) was formerly known as Kansas Explorations, Inc.  Gold Fields Mining, LLC (Gold Fields) conducted mining operations as Tri-State Zinc, Inc., and NL Industries, Inc. (NL Industries) operated under the name St. Louis Smelting and Refining Company.  These entities are referred to herein as the "mining defendants."  There is no dispute that predecessor entities of the mining defendants conducted mining operations in the Tri-State Mining District.

As early as 1897, Congress allowed Tribal members to lease allotted land to mining companies, subject to oversight by the Department of the Interior for the protection of "incompetent" Tribal members.  In 1909, Congress authorized the Secretary of the Interior to promulgate regulations for mining activity on allotted land.  The parties agree that the Tribe was not involved with the lease or regulation of allotted land for mining purposes.  In 1921, Congress extended the restriction on alienation of certain allotted lands and authorized the Secretary of the Interior to determine the terms and conditions for mineral leases on all allotted lands.  However, the Secretary was also authorized to remove any restriction on alienation for land held by a Tribal member deemed "incompetent," and the Secretary could decide whether to grant a mining lease without consent of the Tribal member.  The Secretary promulgated comprehensive regulations governing mining on restricted land in 1929.  The regulations did not give the Tribe any role in the leasing process or permit the Tribe to regulate mining activity.  The United States government had authority

---

[2]     The Environmental Protection Agency (EPA) designated much of the former Tri-State Mining District as the Tar Creek Superfund Site (Tar Creek), and has been conducting some type of remedial operation at Tar Creek since 1983.  The EPA's activities and the status of remedial operations are not relevant to issues of Tribal standing, but are discussed more fully in a previous opinion and order.  See Dkt. # 560.

to review a mining company's request to remove underground support pillars, but a study released by the United States Army Corp of Engineers in January 2006 suggests that this authority was rarely exercised. Dkt. # 652, Ex. 9, at 36. Mining leases on unrestricted fee land were not subject oversight by the Department of the Interior.

Individual Tribal members are currently free to use their own land subject to some minimal oversight by the Tribe but, in recent years, the Tribe has taken a greater role in regulating the use of natural resources on restricted land and monitoring perceived environmental hazards. The record also supports the Tribe's assertion that it has used Tribal land and resources to preserve Tribal traditions and culture. However, individual Tribal members have authority to decide how their own land is used and individual Tribal members receive revenue from beneficial uses of their land. Dkt. # 620, Ex. 17, at 2-3; id., Ex. 18, at 3. For example, plaintiff Florence Mathews testified at her deposition that she could give hunting or fishing leases or use natural resources on her land without approval of the Tribe. Id., Ex. 14, at 3-7. The Tribe disputes that a significant number of Tribal members have benefitted from mining leases, but does not dispute that income from mining leases has gone to individual Tribal members rather than the Tribe itself. Dkt. # 620, Ex. 5, at 12, 17. Concerning the historical use of allotted lands, the Tribe disputes defendants' assertion that Tribal members voluntarily entered mining leases on allotted lands, and suggests that pressure from external sources or an involuntary declaration of a Tribal member's incompetence by the Secretary of the Interior were behind many of the mining leases, especially after 1921. Dkt. # 620, Ex. 7, at 5-7.

The parties do not dispute that the Tribe is economically stronger than it was in past years, and the Chairman of the Tribal Business Committee, John Berrey, states that the Tribe has "taken

4

advantage of the opportunities that have arisen to us, either in the Indian Gaming Regulatory Act or Indian Consolidation Act or other legislation that's been passed." Dkt. # 652, Ex. 11, at 12. However, the Tribe disputes defendants' implication that the Tribe was weaker in terms of maintaining its cultural heritage in past years. With its strengthened economic condition, the Tribe has been able to purchase additional fee lands. The Tribe currently owns five parcels of land within Tar Creek. One of those parcels was purchased after 2001 and the remaining four parcels of land were purchased after 2005. The lands are treated as fee land subject to Tribal jurisdiction, but the mining defendants claim that their predecessor entities used the land for mining long before the Tribe had an ownership interest in the property. The parties have identified property used by the mining defendants for historical mining activity, and the Tribe acknowledges that it owns in fee simple only one parcel of land actually used for mining activity.[3] However, the Tribe states that much of the property historically used for mining is Tribal trust land or restricted fee land. The Tribe does not dispute that neither it nor Tribal members have any ownership interest in property formerly used for mining by NL Industries, but the Tribe states that it owns two tracts of land adjacent to these properties.

Tribal Governance and the Decision to File this Lawsuit

The Tribe is a federally recognized Indian tribe that has maintained some form of tribal government throughout the twentieth century. BNSF claims that the Tribe was described as "unorganized" in historical documents and the Tribe lacked governmental infrastructure to allow it to function as an organized governmental body. Dkt. # 628, at 6. It is undisputed that the Tribe

---

[3]     Specifically, the Tribe owns one parcel of land subleased to Doe Run by Eagle Picher Industries, Inc. Dkt. # 652, Ex. 17, at 9-11.

was an unorganized tribe under the Oklahoma Indian Welfare Act, 25 U.S.C. § 901 et seq., until the

1980s, but the Tribe states that it had some form of leadership.  However, the Tribe states that

historical use of the word "unorganized" reflects a reluctance on the part of the Tribe to adopt formal

governmental structures, such as a written constitution, but the Tribe actively maintained its cultural

heritage, property, and natural resources through recognized Tribal leaders.  Dkt. # 651, at 19.

In 1956, the Tribe created the Quapaw Tribal Business Committee (QTBC), in part to

determine how to allocate funds from a judgment in favor of the Tribe by the Indian Claims Court,

but this was not the sole reason for the creation of the QTBC.[4]  Dkt. # 651, Ex. 3, at 16.  At a

meeting on August 19, 1956, the Tribe formed the QTBC to "transact tribal business," because it

recognized that it was "expensive and inconvenient" for the entire Tribe to meet to conduct business

for day-to-day matters.  Dkt. # 628, Ex. 18, at 31.  The QTBC has the authority to:

> appoint subordinate committees and representatives; to transact business of the
> Quapaw Tribe, including the management or disposition of tribal property and the
> expenditure of tribal funds . . . and such additional business of the Tribe as the
> Quapaw Indian Council may see fit to delegate to the [QTBC] from time to time by
> appropriate resolution.

Id. at 32.  The chairman of the QTBC "preside[s] at all meetings" and is "entitled to vote on all

questions" presented to the QTBC.  Id.  The Tribe's historical expert, W. David Baird, states that

the formation of the QTBC represented a compromise that allowed the Tribe to handle business

matters through the QTBC while maintaining its traditional government through a General Council.

---

[4]     The Tribe objects to consideration of BNSF's arguments to the extent that the Court is
required to consider matters of Tribal law.  In this Opinion and Order, the Court is simply
reviewing the documents presented by the parties to the limited extent necessary to consider
BNSF's arguments, and no statement of the Court is a binding interpretation of Tribal law.

Id., Ex. 24, at 3.  At a General Council meeting on March 17, 1984, Tribal leaders suggested that the General Council had the authority to direct or even disband the QTBC.  Id., Ex. 29, at 5.

BNSF claims that the Tribe does not have a "recognized Constitution or governing document," except for the August 19, 1956 resolution creating the QTBC.  Dkt. # 628, at 9. According to BNSF, the General Council is the only governmental body with the power to authorize the filing of a lawsuit on behalf of the Tribe.  The Tribe responds that the Quapaw Code authorizes governmental action or the creation of new law in three ways:

> (1) through statutes and ordinances enacted by the General Council and/or the [QTBC], (2) through resolutions enacted by the General Council and/or the [QTBC], and (3) through administrative regulations adopted by the [QTBC].

Dkt. # 651, at 24.  The Tribe claims that the QTBC is authorized to conduct Tribal business and, as a matter of Tribal law, this has been interpreted to mean that the QTBC is the proper body to authorize the filing of a lawsuit on behalf of the Tribe.  Id. at 56.

On August 16, 2003, the QTBC authorized the filing of this lawsuit and retained counsel. Dkt. # 651, Ex. 23, at 4.  The minutes of the QTBC's meeting state that "the Tribe is going to file what's probably the largest environmental lawsuit in the state, or even in the nearest four-five state areas."  Id.  The General Council discussed the status of this litigation in 2004 and 2005, but there is no evidence that the General Council approved the filing of this case.  See id., Exs. 25 and 26. BNSF claims that the General Council only could authorizing the filing of this case, because this power was not specifically delegated to the QTBC.

BNSF asserts that, even assuming that the QTBC could authorize the filing of this lawsuit, the Tribe failed to exercise its sovereign powers at any time while mining activities were ongoing and the Tribe waived its right to file a lawsuit.  BNSF has submitted evidence showing that the

Department of the Interior, rather than the Tribe, stepped in in the 1920s and 1930s to file lawsuits on behalf of Tribal members who alleged that mining companies fraudulently obtained mining leases from members of the Tribe.  Dkt. # 628, Ex. 1, at 42-43.  BNSF claims that the Tribe has not actively protected its natural resources throughout the twentieth century, and points out that the Tribe did not enact the Quapaw Environmental Code until 1994.  See id., Ex. 44.  BNSF also claims that federal and state governments have regulatory authority on Tribal land, and the Tribe lacks standing to protect many types of natural resources.  Dkt. # 628, at 20-21.  The State of Oklahoma and the EPA issue licenses for the discharge of pollutants into water on Tribal land and issue closure letters for the removal of underground storage tanks.  Id., Ex. 46, at 8-9, 11.  The EPA and the Oklahoma Department of Environmental Quality have authority to remove soil associated with the removal of underground storage tanks.  Id. at 12.   The Tribe also does not have any authority to enforce the Clean Air Act, 42 U.S.C. § 7401 et seq., on Tribal lands, because it has not been designated as a state for this purpose by the federal government.  Id. at 15.

The Tribe disputes BNSF's assertion and claims that it works with state and federal governments to protect the environment.  Dkt. # 651, at 20-22.  In 1999, the Tribe obtained status as a state under the Clean Water Act, 33 U.S.C. § 1251 et seq., and it receives funding from the federal government for water quality monitoring programs.  Dkt. # 651, Ex. 11.  The Tribe acknowledges that it is not a state under the Clean Air Act, but that it has applied for state status and it receives funding from the EPA to operate four monitoring sites to sample air quality within Tar Creek.  Id., Ex. 13, at 6-10, 19.  The Tribe does not have authority to grant or deny permits for air pollution sources on Tribal land, but the Quapaw Environmental Director, Tim Kent, states that the EPA consults with the Tribe before issuing a permit that would affect Tribal land.  Id. at 23-24.  The

8

Tribe claims that it has the authority to designate surface water within the historical boundaries of the Quapaw Reservation for the beneficial use of the Tribe or its members.  Id. at 17-18.

Procedural History

On December 10, 2003, the Tribe and certain Tribal members filed this lawsuit against Asarco, Inc., Blue Tee, Childress Royalty Comp., Inc., Doe Run, Eagle-Picher Industries, Inc., Gold Fields, and NL Industries.[5]  Plaintiffs originally sought to certify a class of former or current landowners whose property had been damaged by the defendants' actions and the Tribe alleged common-law tort claims against the defendants under the parens patriae doctrine.  Plaintiffs requested compensatory and punitive damages in an unspecified amount from the mining defendants. In a subsequent pleading, plaintiffs added Burlington Northern and Santa Fe Railway Company (BNSF) as a party.[6]  The current operative pleading is the fifth amended complaint and the remaining defendants are the mining defendants and BNSF.  Plaintiffs allege claims of public nuisance, private nuisance, trespass, strict liability, and negligence against defendants, and ask the Court to:

> 1.   Pursuant to [the Tribe's] action for public nuisance under the common law public trust doctrine, parens patriae, as well as pursuant to its police powers to protect the safety, health, and welfare of its members, award Plaintiff Quapaw Tribe compensation for all past loss-of-use natural resources from the time of any and all hazardous substance releases until July 7, 2008, together with cost of assessing injury to the natural resources and resulting damage;

---

[5]   The original complaint named Asarco, Inc., Childress Royalty Comp., Inc., and Eagle-Picher Industries, Inc. as parties.

[6]   In previous opinions and orders (Dkt. ## 473, 560, 648), the Court provided an overview of the various amended complaints filed by plaintiffs and changes in plaintiffs' claims and the parties to the lawsuit as the case has proceeded.

2.      Award Plaintiff Quapaw Tribe compensatory damages sufficient to abate the public nuisance of subsidence and subsidence risk or, in the alternative, an injunction requiring abatement;

3.      Award Plaintiff Quapaw Tribe and Individual Plaintiffs compensatory damages for Defendants' wrongful acts and omissions as complained of herein;

4.      Award Plaintiff Quapaw Tribe and Individual Plaintiffs exemplary or punitive damages for Non-Federal Defendant's acts complained of herein; . . . .

Dkt. # 570, at 47.   In connection with each claim, the fifth amended complaint offers some clarification of the remedies sought by the Tribe and individual Tribal members.   As a remedy for the alleged public nuisance, the Tribe requests compensatory damages to "abate the subsidence and subsidence risk," and for all "past loss-of-use natural resources damages from the time of any hazardous substance release . . . until July 7, 2008," with the limitation that any natural resources damages "shall be available for use only to restore, replace, or acquire the equivalent of such natural resources and resulting damage . . . ."  Id. at 38-39.  The Tribe requests similar relief on its claims of strict liability and negligence.  Id. at 45, 46-47.  The Tribe and individual landowners also seek unspecified compensatory damages for private nuisance and trespass.

On October 26, 2007, the Tribe provided defendants with its first supplemental Rule 26(a) disclosures, dkt. # 620, Ex. 1, supplementing its initial disclosures with additional information about its damages calculations.[7]  Plaintiffs state that they attempted to determine the location of historical mining leases and defendants' areas of operation, including locations where BNSF operated.  Id. at 7.  Plaintiffs decided to apply an agricultural enterprise model to calculate past loss-of-use damages

---

[7]     The supplemental disclosures did not provide any information about the individual plaintiffs' damages, except to note that the individual plaintiffs were seeking abatement and property damage in an unspecified amount.  Id. at 11.

for farming and riparian land, and reviewed historical documents to determine what crops were sustainable before mining activities began in the region. The Tribe considered several models to calculate damages: a hay only model; a wheat, corn, soybean, and fallow rotation model; a rental value only model; and a pecan enterprise model for riparian lands. For the hay only model, the Tribe calculated loss revenues based on estimated hay production between 1919 and 2005, with interest applied to the lost revenue. For the crop enterprise model, the Tribe used three distinct time intervals - 1910-1957, 1958-1980, and 1981-2005 - to account for advances in farming techniques, and calculated the net return on farming activities. For the rental value model, the Tribe used an estimated annual rental rate per acre and calculated an estimated lost rental value. Finally, the Tribe used historical documents showing that each acre of riparian land could be used to produce between 500 and 1000 pounds of pecans per year, and calculated lost revenue and accrued interest from loss of native pecan orchards from 1919 to 2005. Using these models, the Tribe estimated that it was seeking at least $175 million and as much as $775 million collectively from defendants for lost use of natural resources. Id. at 12-13.

The Tribe also stated that it was seeking damages for abatement of subsidence or subsidence risk on Tribal lands used by each of the mining defendants. The Tribe's preliminary calculations are based on three factors:

> (a) each individual defendant's representations in the Joint Response to September 29, 1994 Information Request that it contributed to the creation of certain mining voids as summarized in the Individual Leases Map included as Exhibit "I", (b) calculation of the volume of the relevant mine working areas in the 1986 publication "Stability Problems Associated with Abandoned Underground Mines in the Picher Field Northeastern Oklahoma" (Oklahoma Geological Survey Circular 88) by Kenneth V. Luza, and (c) a backfill remedy with a unit cost of $20.11 as summarized in Exhibit "J".

Id. at 10.  Based on a "conservative" estimate, the Tribe stated that it was seeking $369,382,979.30 from Blue Tee, $12,005,951.54 from Gold Fields, $57,678,216.65 from Doe Run, and $42,867,145.34 from NL Industries to abate subsidence or the risk of subsidence on Tribal land.  Id. at 14-17.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

The mining defendants argue that the Tribe lacks standing to bring claims belonging to the individual landowners, because these claims are outside of the Tribe's quasi-sovereign interest in the health and well-being of Tribal members.  The mining defendants raise five arguments concerning the Tribe's standing to bring any claims alleged in the fifth amended complaint: (1) the Tribe lacks standing under Article III of the United States Constitution to bring claims belonging to private landowners; (2) the Tribe may not use the parens patriae doctrine to assert claims of private economic injury to the Tribe's citizens; (3) the Tribe is a domestic dependent nation with more limited sovereign powers than a state government; (4) the Tribe may not rely on the public trust doctrine or its police powers to pursue claims for damages to private property; and (5) the Tribe may not sue for damage to property acquired after the alleged property damage occurred.  Dkt. # 618, at 2-3.

## A.

The mining defendants assert that the Tribe lacks standing under Article III because the Tribe has not suffered an injury to a quasi-sovereign interest.[8]  They argue that the Tribe's claims under

---

[8]      The same argument is also raised by BNSF and, to the extent that BNSF's arguments overlap with those of the mining defendants, BNSF's motion for summary judgment will also be addressed at this time.  BNSF raises other arguments beyond those raised by the mining defendants, and those arguments will be addressed below.  See IV, infra.

Oklahoma common law belong to the individual landowners.  The Tribe responds that it unnecessary for the Tribe to establish Article III standing under the traditional three-part test, because it has standing under the <u>parens</u> <u>patriae</u> doctrine.

Article III of the United States Constitution limits federal courts to the adjudication of "cases or controversies." U.S. CONST. art. III, § 2, cl. 1.  "The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate." <u>Tandy v. City of Wichita</u>, 380 F.3d 1277, 1283 (10th Cir. 2004); <u>see</u> <u>also</u> <u>Allen v. Wright</u>, 468 U.S. 737, 750-51 (1984).  The Supreme Court has recognized three elements for standing under Article III:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992).  The standing requirement ensures that  "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  <u>Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 472 (1982).  The primary focus for any analysis of standing under Article III "is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury." <u>Morgan v. McCotter</u>, 365 F.3d 882, 888 (10th Cir. 2004).  The party invoking the jurisdiction of a federal court has the burden to establish Article III

14

standing.  New England Health Care Employees Pension Fund v. Woodruff, 512 F.3d 1283, 1288 (10th Cir. 2008).

The Tribe argues, and the Court agrees, that the requirements of Article III will be satisfied if the Tribe demonstrates that it has parens patriae standing to bring claims for NRD.  See Massachusetts v. EPA, 549 U.S. 497 (2007) (distinguishing requirement for a state to have standing to sue from the Lujan test); Glanton ex rel. ALCOA Prescription Drug Plan v. Advanceps Inc., 465 F.3d 1123, 1126 (9th Cir. 2006) (noting that governmental entities have standing under Article III if they can demonstrate parens patriae standing); Massachusetts v. Bull HN Information Systems, Inc., 16 F. Supp. 2d 90, 103 (D. Mass. 1998) ("Because the Commonwealth has parens patriae standing to pursue this action, Article III no longer poses an obstacle.").  However, the Tribe's alleged quasi-sovereign interest must be clear enough for the Court to ascertain whether the Tribe is attempting to assert the private claims of its citizens, or the Court must dismiss some or all of the Tribe's claims for lack of standing under Article III.  See Oregon v. Legal Servs. Corp., 552 F.3d 965, 974 (9th Cir. 2009); New York v. Microsoft Corp., 209 F. Supp. 2d 132, 148-49 (D.D.C. 2002). Federal courts have found that, in some cases, a state has standing to sue to protect its quasi-sovereign interest in the land or environment, even if the property is owned by a private person. Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907) (State of Georgia had standing to seek injunction against Tennessee copper companies to prevent the discharge of noxious fumes); Missouri v. Illinois, 180 U.S. 208 (1901) (State of Missouri had standing to sue the State of Illinois to prevent discharge of sewage into the Mississippi River); United States v. Hooker Chemicals & Plastics Corp., 749 F.2d 968 (2d Cir. 1984) ("Once quite limited, the concept of parens patriae standing has been expanded to include actions in which a state seeks to redress quasi-sovereign

interests, such as damage to its general economy or environment, even where the injury is to a fairly narrow class of persons."). Thus, the first issue to be resolved is whether the Tribe is truly bringing claims against defendants in its quasi-sovereign capacity.

In Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592 (1982), the Supreme Court discussed the requirements for a state or governmental entity to bring a parens patriae action. A state has standing to protect its sovereign interests in (1) enacting and enforcing a legal code; (2) demanding recognition from other sovereign entities; and (3) protecting the state's proprietary interests. Id. at 601. In some circumstances, a governmental entity may have standing to protect a "quasi-sovereign interest" separate and apart from the three types of sovereign interests noted above. While a state undoubtedly has standing to file a lawsuit to protect its sovereign interests, the circumstances when a state may file a parens patriae action asserting the rights of its citizens are more limited. In Snapp, the Supreme Court provided the following guidelines for the filing of a parens patriae action:

> In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development-neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract-certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being-both physical and economic-of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

> The Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens*

16

> *patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking process.

Id. at 607-08.

Snapp created a limited exception to the ordinary standing requirements under Article III of the United States Constitution, but this exception has been narrowly construed. Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 335 (1st Cir. 2000). To establish parens patriae standing under Snapp, the plaintiff must allege the following three elements: "(1) the State must have 'alleged injury to a sufficiently substantial segment of its population;' (2) the State 'must articulate an interest apart from the interests of particular private parties;' and (3) the state 'must express a quasi-sovereign interest.'" Connecticut v. Physicians Health Servs. of Connecticut, Inc., 103 F. Supp. 2d 495 (D. Conn. 2000). The governmental entity must also show that the threatened injury is not speculative. Table Bluff Reservation v. Philip Morris, Inc., 256 F.3d 879 (9th Cir. 2001); Chiles v. Thornburgh, 865 F.2d 1197, 1208 (11th Cir. 1989); People of State of Illinios v. Life of Mid-America Ins. Co., 805 F.2d 763 (7th Cir. 1986). The Tenth Circuit has made clear that a governmental entity does not have standing to "assert the rights of private individuals." Satsky v. Paramount Communications, Inc., 7 F.3d 1464, 1469 (10th Cir. 1993).

Indian tribes, like states and other governmental entities, have standing to sue to protect sovereign or quasi-sovereign interests. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976) (Indian tribe had standing as a tribe, apart from the claims of individual tribal members, to challenge state motor vehicle tax); Prairie Band of Potowatomi Indians v. Pierce, 253 F.3d 1234, 1241 (10th Cir. 2001) (tribe had standing to sue Kansas to prevent interference with or infringment on tribe's right to self-government). A tribe can have standing to sue to protect its own interests or, in appropriate situations, the interests of its

members through a <u>parens</u> <u>patriae</u> action.  <u>Delorme v. United States</u>, 354 F.3d 810 (8th Cir. 2004).

Regardless of whether a tribe files a claim in its sovereign capacity or on behalf of its members, it

must still prove an injury-in-fact sufficient to satisfy the standing requirement of Article III of the

United States Constitution.  <u>Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.</u>, 256 F.3d

879, 885 (9th Cir. 2001).  In particular, when filing a <u>parens</u> <u>patriae</u> action, a tribe must show that

all or a substantial portion of its members have suffered an injury.  <u>United States v. Santee Sioux</u>

<u>Tribe of Nebraska</u>, 254 F.3d 728 (8th Cir. 2001).

      The Tribe has the burden to demonstrate that its damages are limited to those incurred in its

quasi-sovereign capacity and that it is not attempting to recover for harm to purely private interests.

This is especially true in this case, because the individual Tribal members have filed their own

claims for damage to their property.  The Tribe argues that any detailed assessment of its claims for

damages is premature, because the first phase of litigation was directed only at determining the

Tribe's standing to bring its claims, rather than the type of damages that the Tribe could recover.

However, if the Tribe lacks standing to recover certain remedies for its state law claims, the Tribe

should be not be permitted to conduct discovery on those issues and add to the expense and

complication of an already complex case.  The Tribe claims that it may revise its assessment of its

damages and it may wish to supplement its initial disclosures as to damages after more discovery

on liability is produced.  The Court does not disagree with the Tribe's right to supplement its initial

disclosures but, if the Tribe is seeking remedies that the Tribe clearly lacks standing to recover, it

is not premature to dispose of those issues on a motion for summary judgment at the close of the first

phase of litigation.

The Tribe states that it seeks to recover for natural resources damages (NRD) as to three types of property within its former reservation: (1) all land "within the [former] Quapaw Reservation on restricted lands of the members of the Tribe;" (2) "on lands held in trust for the Tribe;" and (3) "on lands owned in fee simple by the Tribe." Dkt. # 570, at 2. Although the Tribe uses the word "reservation" throughout its fifth amended complaint, the historical boundaries of the former Quapaw Reservation do not determine the land over which the Tribe may exert sovereign authority. See Oklahoma Tax Comm'n v. Citizen Band Potowatomi Indian Tribe of Oklahoma, 498 U.S. 505, 510 (1991). The Court must look to the current status of the land, rather than the historical designation of the land as a reservation, to determine whether the Tribe has authority to assert claims against non-members arising on that land. The Tribe has civil and criminal jurisdiction over the activities of its members, and limited authority over the activities of non-members, on land designated as "Indian Country" under 18 U.S.C. § 1151(a). California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 n.5 (1987); DeCoteau v. Dist. County Court for the Tenth Judicial Dist., 420 U.S. 425, 427 n.2 (1975). The Tribe clearly has authority to protect the interests of its members on land held in trust for the Tribe by the federal government. HRI, Inc. v. EPA, 198 F.3d 1224 (10th Cir. 2000). This is true even if the trust land is located outside of the historical boundaries of the Quapaw Reservation. United States v. Azure, 801 F.2d 336, 339 (8th Cir. 1986). The Tribe has authority to regulate activities on "Indian allotments, whether restricted or held in trust by the United States." Mustang Production Co. v. Harrison, 94 F.3d 1382, 1385 (1996) (quoting Oklahoma Tax Commission v. Sac and Fox Nation, 508 U.S. 114, 123 (1993)). The Tribe also has limited inherent authority to regulate some activities of non-members on fee land. See Burrell v. Armijo, 456 F.3d 1159 (10th Cir. 2006); Knight v. Shoshone and Arapahoe Indian Tribes of the Wind River

Reservation, Wyoming, 670 F.2d 900, 902 (10th Cir. 1982).  Concerning the three types of land described by the Tribe in the fifth amended complaint, there is no question that the Tribe has some measure of authority over each of the three categories of land identified by the Tribe.  This does not mean that the Tribe can bring any type of claim on behalf of its members for injury to these lands, but it is a useful starting point for the Court's inquiry.

The Court finds that the Tribe is the appropriate party to bring a claim for NRD as to Tribal land, because private landowners cannot recover these damages.  See Alaska Sport Fishing Ass'n v. Exxon Corp., 34 F.3d 769, 773 (9th Cir. 1994) ("State governments may act in their parens patriae capacity as representatives for all citizens in a suit to recover damages for injury to [natural resources].");  State of Maine v. M/B Tamano, 357 F. Supp. 1097 (D. Me. 1973); State of Maryland, Dep't of Natural Resources v. Amerada Hess Corp., 350 F. Supp. 1060 (D. Md. 1972).  A sovereign entity has a "quasi-sovereign interest . . . 'independent of and behind the titles of its citizens, in all the earth and air within its domain.'"  Commonwealth of Puerto Rico ex rel. Quiros v. Bramkamp, 654 F.2d 212,  216 (2d Cir. 1981) (quoting Tennessee Copper Co., 206 U.S. at 237).  A parens patriae suit by a natural resources trustee does not bar a subsequent suit by private individuals, but a necessary part of a natural resources trustee's case is to clearly delineate what damages the natural resources trustee may recover in a parens patriae suit and what damages belong to private citizens. See In re Exxon Valdez, 270 F.3d 1215 (9th Cir. 2001) (consent decree between federal and state natural resources trustees and Exxon did not bar private claims for loss of business attributable to the Exxon Valdez oil spill); Kelley for and on Behalf of People of State of Michigan v. United States, 618 F. Supp. 1103, 1009 (W.D. Mich. 1985) ("the state may of course proceed on behalf of the people of the State of Michigan and recover its response costs, etc.; but it may not represent the

individual interests of private parties, such as East Bay Township, its residents and businesses and recover response costs incurred solely by them").

The Tenth Circuit has not directly addressed the scope of NRD in this type of case but the Tenth Circuit's description of the NRD available in New Mexico v. General Electric Co., 467 F.3d 1223 (10th Cir. 2006), shows that NRD are limited to only those damages sustained by the natural resources trustee in its sovereign capacity:

> we have no quarrel with the general proposition that the State, in its capacity as trustee of the State's groundwaters, is entitled to recover for all interim loss-of-use damages on behalf of the public from the time of any hazardous waste release until restoration: "Lost use damages incurred by the public prior to cleanup are damages that, in a laymen's terms, remain on the debit side of the ledger after cleanup, and are, in fact, unredressed damages for which the trustee[ ] may recover." *Alaska Sports Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994).  Any such remedy, however, must be tailored to redress specific injury to the State's role as trustee, i.e., its role of making water available for appropriation and beneficial use by water rights holders.  Claims of impairment of beneficial use are better left to water rights holder whose uses are impaired.

Id. at 1243 n.39 (emphasis added).  New Mexico also stands for the proposition that the Tribe's remedies are preempted by the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), if the state law remedies would conflict with CERCLA's remedial scheme.  Under CERCLA, private parties are not permitted to recover damages "to natural resources held in trust by the federal, state or tribal governments nor does it allow public trustees to recover for damages to private property or other 'purely private' interests." Nat'l Ass'n of Mfrs. v. United States Dep't of the Interior, 134 F.3d 1095, 1113 (D.C. Cir. 1998).

Both parties rely on Satsky v. Paramount Communications, Inc., 7 F.3d 1464 (10th Cir. 1993), the leading Tenth Circuit case discussing the difference between private and public damages in an environmental case.  In Satsky, the State of Colorado filed a lawsuit against Paramount

Communications, Inc. (Paramount) to recover NRD under CERCLA, and later added a claim for response and clean-up costs under CERCLA. The State also asserted common law claims of nuisance, strict liability, and negligence, but these claims were later dismissed. Paramount entered into a consent decree with the State to resolve the State's claims for NRD and response costs. A group of private plaintiffs believed that Paramount's actions taken to implement the consent decree were causing greater harm to the environment, and filed their own lawsuit on behalf of themselves and other similarly situated persons alleging negligence, strict liability, nuisance, trespass, and misrepresentation. Id. at 1467. Paramount sought summary judgment on the plaintiffs' common law claims on the ground that the claims were barred by res judicata, because the consent decree between Paramount and the State fully adjudicated those claims. The district court granted Paramount's motion. The Tenth Circuit reversed the dismissal of the plaintiffs' claims, because the State lacked standing in the prior case to assert claims belonging to the individual plaintiffs. While it is "clear that a state may sue to protect its citizens against 'the pollution of the air over its territory; or of interstate waters in which the state has rights,' . . . [i]t is equally clear, however, that a state may not sue to assert the rights of private individuals." Id. at 1469. The citizens of Colorado were bound by the consent decree to the extent that the prior action adjudicated the rights of the public for harm to natural resources, but purely private claims could not have been resolved by the consent decree. The plaintiffs requested damages for:

> property damage, diminution of value to real estate, loss of income and other economic losses including loss of asset value, increased operating expenses, increased costs of personal protection from contaminated domestic water or the threat of contaminated domestic water, loss of water quality or quantity, loss or enjoyment of real property, mental anguish, and emotional distress and an increased risk of harm and an increased risk of contracting fatal or otherwise serious illnesses.

Id. at 1470.  The Tenth Circuit remanded the case to the district court to determine which alleged injuries were purely private and thus not barred by res judicata.  On remand, the district court allowed the individual plaintiffs to proceed with their claims for business and economic damages, including lost revenue or use of the land, harm to private water rights, and response costs associated with private property that could not have been recovered by the State.  Satsky v. Paramount Communications, Inc., 1996 WL 1062376 (D. Colo. 1996).

The Tribe argues that it can recover damages for lost use of land owned by Tribal members, based on an agrarian use model, due to the Tribe's history of communal farming and hunting before allotment of Tribal lands.  Dkt. # 651, at 36-39.  The Tribe claims that the Commissioner of Indian Affairs issued a report in 1853 stating that the Tribe grew wheat, corn, sweet potatoes, Irish potatoes, peas, beans, watermelon, and musk melon.  Dkt. # 651, Ex. 1, at 16-17.  Members of the Tribe supplemented their diets by hunting and fishing on Tribal lands.  The Tribe also claims that Tribal members historically gathered wild roots, nuts, fruit, and vegetables, and some members of the Tribe currently engage in the same activities.

The Tribe's quasi-sovereign interest is significantly more limited than the Tribe's request for damages in its initial Rule 26 disclosures suggests.  Even if the Tribe engaged in communal agricultural activities before allotment, the land became the property of individual Tribal members through the allotment process and the Tribe has acknowledged that economic gain from beneficial use of the land flowed to the actual landowner. The Tribe has brought claims under Oklahoma law, and the Tribe must show that it has a right to recover its requested damages as a matter of Oklahoma law.  Oklahoma law reserves claims for lost beneficial use or reduced value of real property for the individual landowner.  See City of Ardmore v. Orr, 129 P. 867 (Okla. 1913) (private landowner

could recover lost rent caused by nuisance preventing him from leasing building to tenant).  The Tribe, as representative of its citizens, may pursue remedies to redress harm to natural resources, but it may not recover damages for lost private use of land that flow to the private landowner under Oklahoma law.  See New Mexico, 467 F.3d at 1246-47 (sovereign may pursue remedies designed to redress harm to natural resources only, and state law remedies that would permit an unrestricted award of monetary damages are preempted by CERCLA).  The fact that Tribal members historically gathered wild foods or hunted and fished on Tribal land does not change the character of the damages requested in this case from private to public as a matter of Oklahoma law, and the Tribe may not use parens patriae standing to expand the remedies available to it under Oklahoma law. Defendants have also raised a valid point that some of the land identified by the Tribe was recently acquired, and neither the Tribe nor Tribal members owned this land during the entire period of time listed in the Tribe's supplement to its initial disclosures.  This may place an additional limitation on the Tribe's ability to recover NRD.

While there may be limitations on the scope of the Tribe's common law claims seeking NRD, the Court finds that the Tribe has standing to assert claims for NRD on behalf of Tribal members.  In a prior opinion and order, the Court determined that the alleged harm to the environment affects the health and well-being of a substantial number of Tribal members, and the Court will not revisit the issue.  Dkt. # 473, at 10.  To the extent the Tribe is seeking to recover damages to NRD on Tribal land, these claims may not be asserted by individual Tribal members and are separate and apart from any claims belonging to Tribal members.  Finally, the Tribe has a quasi-sovereign interest in protecting natural resources on Tribal land.  The Court will not attempt to determine exactly what types of damages may be available to the Tribe, because such an assessment

would be premature based only on the Tribe's initial disclosures.[9]  However, the Tribe may not rely on a loss of use model to calculate its damages, and it must provide a reasonable calculation of damages based on actual harm to natural resources over which the Tribe may act as a natural resources trustee.[10]

## B.

The mining defendants argue that the Tribe lacks <u>parens patriae</u> standing to recover damages for subsidence or the risk of subsidence, because the Tribe's alleged interest in the land is not separate from the interests of the individual landowner who may have been injured by subsidence. Defendants also argue that none of the parcels of land with a subsidence risk is owned by Tribal members, and there is no factual basis for a subsidence claim.  Dkt. # 618, at 48.  The mining defendants argue that, even if the Tribe is attempting to recover damages for subsidence on land owned by Tribal members,  those individuals have brought their own claims in this lawsuit and the

---

[9]     Defendants ask the Court to sanction the Tribe by limiting the Tribe to its damages calculation in its supplemental initial disclosures.  Defendants argue that the Tribe is "permanently committed" to a loss of use model, because it failed to produce any other model for damages as part of its initial disclosures.  Dkt. # 677, at 10.  The Court declines to impose such a sanction.  The fifth amended complaint gives sufficient notice that the Tribe is seeking all available NRD under Oklahoma law, and the Tribe is not barred from supplementing its initial disclosures with a new damages calculation.  However, the Tribe should expeditiously supplement its initial disclosures as to damages to give defendants reasonable time for their experts to review the Tribe's proposed damages calculation.

[10]    This ruling also disposes of defendant's argument that the Tribe lacks authority to pursue its claims under the public trust doctrine.  Dkt. # 618, at 72-77.  In <u>New Mexico</u>, the Tenth Circuit stated that a sovereign's right to bring a claim under the <u>parens patriae</u> doctrine is limited by the sovereign's trusteeship over natural resources under the public trust doctrine. <u>New Mexico</u>, 467 F.3d at 1243 n.30.  Neither party has briefed what natural resources may fall within the Tribe's powers under the public trust doctrine and the Court declines to reach the issue.  However, a necessary part of the Tribe's claim for damages will be to show that it actually has trusteeship over the natural resources that it is claiming defendants have harmed.

subsidence claims belong solely to the individual landowners.  Id. at 51-52.  The Tribe responds that it has standing under Oklahoma law to bring a public nuisance claim, and this permits the Tribe to seek damages for alleged subsidence or the risk of subsidence on behalf of Tribal members.  Dkt. # 652, at 44-45.  It argues that it has a quasi-sovereign interest in the abatement of any subsidence risk on Tribal lands, and it has parens patriae standing to proceed with a subsidence claim.  Id. at 67-75.[11]

Underground mining sometimes causes a condition known as subsidence, which is the "rapid sinking of the surface" caused by lack of support underneath the surface of the land.  Utah Environmental Congress v. United States Bureau of Land Management, 119 Fed. Appx. 218, 221 (10th Cir. 2004) (Henry, C.J., concurring).[12]  Subsidence is particularly common after coal mining, but other types of mining can also cause subsidence.  Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987).  The Supreme Court has described subsidence as:

> the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal. This lowering of the strata can have devastating effects.  It often causes substantial damage to foundations, walls, other structural members, and the integrity of houses and buildings. Subsidence frequently causes sinkholes or troughs in land which make the land difficult or impossible to develop. Its effect on farming has been well documented-many subsided areas cannot be plowed or properly prepared. Subsidence can also cause the loss of groundwater and surface ponds.  In short, it presents the type of environmental concern that has been the focus of so much federal, state, and local regulation in recent decades.

---

[11]     The Tribe also argues that it may proceed with a public nuisance claim even if it does not have a quasi-sovereign interest in remedying a subsidence risk, because it has organizational standing to pursue a claim on behalf of Tribal members.  Id. at 76-79.  The Court does not reach this issue, because the Tribe can demonstrate that it has standing under the parens patriae doctrine to proceed with its claims for subsidence damages.

[12]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

Id. at 474-75.  The impact of subsidence on the surface can be "devasting," and extensive damage to the land, natural resources, and property is a likely result of subsidence caused by mining activity. Nat'l Wildlife Federation v. Babbitt, 835 F. Supp. 654 (D.D.C. 1993).

The Tribe requests compensatory damages or injunctive relief due to subsidence or the increased risk of subsidence as part of its public nuisance and negligence claims. Dkt. # 570, at 38, 46.  The Tribe alleges that "[t]he Mining Defendants' creation of, and failure to abate, subsidence and the risk of subsidence also has resulted in a public nuisance."  Id. at 38.  The Tribe seeks "compensatory damages sufficient to abate the subsidence and subsidence risk . . . or, in the alternative, an injunction requiring abatement . . . ."  Id.  As part of its negligence claim, the Tribe alleges that "[t]he Mining Defendants had the duty to act as reasonably prudent operators of their mining leases.  The Mining Defendants also had the duty not to create subsidence and subsidence risks."  Id. at 46.  However, individual Tribal members have also filed claims alleging private nuisance seeking compensatory damages, inter alia, to recover compensatory damages for "widespread subsidence" and the "risk of subsidence."  Id. at 41.

The Tribe argues that the mining defendants overlook Oklahoma public nuisance law as a basis for the Tribe's standing to recover damages for subsidence or the risk of subsidence. Dkt. # 652, at 60.  Under Oklahoma law, a nuisance is defined as:

> unlawfully doing an act, or omitting to perform a duty, which act or omission either:
>
> First.  Annoys, injures or endangers the comfort, repose, health, or safety of others; or
>
> Second.  Offends decency; or
>
> Third.  Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, can or basin, or any public park, square, street or highway; or

27

Fourth.  In any way renders other persons insecure in life, or in the use of property, provided, this section shall not apply to preexisting agricultural activities.

OKLA. STAT. tit. 50, § 1.  This general definition applies to claims for public and private nuisance.

Nichols v. Mid-Continent Pipe Line Co., 933 P.2d 272, 276 (Okla. 1996).  A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."  OKLA. STAT. tit. 50, § 2.  The remedies for a public nuisance include a civil lawsuit and abatement.  OKLA. STAT. tit. 50, § 3.  Generally, a public nuisance claim must be filed by a public body or officer, but a private person may file a public nuisance claim if the defendant's actions are "specially injurious to himself."  OKLA. STAT. tit. 50, §§ 10, 11.

The Tribe's argument concerning Oklahoma public nuisance law misses the mark and does not address the mining defendants' argument that the Tribe is attempting to assert claims belonging to the individual landowners.  While it is true that a "public body or officer" may bring a public nuisance claim, see OKLA. STAT. tit. 50, § 11, this is not a substitute for standing to bring a claim in federal court.  This statute simply identifies who may file a claim to abate a public nuisance, but it does not show that the Tribe has standing to assert subsidence claims that may belong to individual landowners.  The mining defendants argue that a claim for subsidence or the risk of subsidence belongs solely to the actual landowner, and a sovereign may not usurp the landowner's right to recovery for harm to the land caused by subsidence.  Even if a public body or officer can file a claim for public nuisance, this does not mean that the Tribe has standing to recover all remedies alleged in the fifth amended complaint.

The mining defendants argue that the Tribe cannot show that a substantial segment of Tribal members are affected by the alleged subsidence or risk of subsidence and the Tribe may not rely on

28

parens partriae standing to bring a subsidence claim.  Dkt. # 618, at 48.  The mining defendants argue that the Tribe is seeking a remedy that belongs to the private landowners only and it cannot articulate an interest separate and apart from the interest of those landowners in a quasi-sovereign capacity.  Id. at 49-50.  Defendants also argue that Tribe is attempting to use parens patriae to expand the remedies available under Oklahoma law beyond those available to private landowners.  Dkt. # 618, at 54. The Tribe responds that subsidence causes harm to all Tribal members, not just the individual landowner, because many of the lands affected by subsidence contain roads and public resources used by many Tribal members.

The Court finds that genuine issues of material fact preclude summary judgment on the Tribe's standing to recover damages for subsidence or the risk of subsidence.  Oklahoma law does place limits on the Tribe's available remedies for an alleged public nuisance, but it is possible that abatement may be available as a remedy for subsidence.  Subsidence or the risk of subsidence affects all who use certain land, and the impact of subsidence may go beyond harm to the individual landowners.  The parties dispute the amount of land within the scope of the Tribe's claims that may be impacted by subsidence or the risk of subsidence and the severity of the alleged subsidence, and these are genuine issues of material fact that preclude summary judgment.[13]  If the Tribe's

---

[13]     The Tribe cites a report prepared by the Unites States Army Corp of Engineers which found that the "potential for shaft related and non-shaft related subsidence is a very serious threat to the safety and economic well-being of people who reside in and travel through the area." Dkt. # 652, Ex. 9, at 13.  The Tribe also relies on a map produced by BNSF's expert, Ron Skinner, to show the location of mine shafts excavated by the mining defendant's predecessor entities and current locations on Tribal land facing a risk of subsidence.  Id., Exs. 42 and 43.  Although the mining defendants claim that the Tribe is overstating the risk of subsidence, there are genuine issues of material fact concerning the extent of land affected and the severity of subsidence or the risk of subsidence, and the Tribe has produced evidence showing that it has standing to pursue a subsidence remedy.

assessment of subsidence or the risk of subsidence is accurate, there may a community-wide risk presented by the alleged subsidence that goes beyond harm to the individual landowners. Based on the summary judgment record, the Court cannot ignore the possibility that abatement might be a possible remedy for an alleged public nuisance, and the Tribe should be allowed to proceed with its subsidence claims. The mining defendants may re-urge this argument if it becomes clear during discovery in the next phase that the subsidence or risk of subsidence is not as widespread as the preliminary evidence produced by the Tribe suggests, or if the evidence shows that Tribe, in its quasi-sovereign capacity, has not suffered an injury separate and apart from that of the individual landowners.

## C.

The mining defendants argue that the Tribe is a domestic dependent nation with a more limited sovereignty than a state government, and the claims the Tribe is attempting to assert on behalf of its members fall outside of the Tribe's sovereign authority. The mining defendants argue that the Tribe is attempting to regulate the activities of non-members through this lawsuit, and the Tribe cannot proceed with its claims unless it can satisfy one of the two exceptions for tribal regulation of non-members recognized in <u>Montana v. United States</u>, 450 U.S. 544 (1981). The Tribe

responds that Indian tribes have the same right to bring a <u>parens</u> <u>patriae</u> claim as any other sovereign entity and the filing of this lawsuit is not an attempt to regulate the activities of non-members.[14]

Indian tribes are sovereign entities that exist separately from the state or federal governments, and have many of the same rights as those sovereigns. "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 55 (1978). However, "Congress exercises plenary power over Indian affairs, and thus 'may restrict the retained sovereign powers of the Indian tribes.'" <u>Hydro Resources v. EPA</u>, 562 F.3d 1249, 1266 (10th Cir. 2009) (quoting <u>Washington v. Confederated Bands & Tribes of Yakima Indian Nation</u>, 439 U.S. 463, 501 (1979)). The inherent sovereign powers of an Indian tribe generally do not permit a tribe to regulate the activities of non-members. <u>MacArthur v. San Juan County</u>, 497 F.3d 1057, 1070 (10th Cir. 2007).

The Supreme Court has placed limits on the power of an Indian tribe to regulate non-members, and these limitations apply regardless of the type of land involved. <u>See</u> <u>Nevada v. Hicks</u>, 533 U.S. 353, 359-60 (2001). Indian tribes retain the inherent power to exercise civil jurisdiction over non-members to some extent, but a tribe's exercise of jurisdiction must fall within one of two exceptions. <u>MacArthur</u>, 497 F.3d at 1070. First, "[a] tribe may regulate, through taxation,

---

[14]    The Tribe argues that this line of argument is foreclosed by a prior opinion and order (Dkt. # 473), and the Tenth Circuit's decision on an interlocutory appeal. This argument is meritless. The Tribe construes language in a prior opinion and order out of context, and this Court did not state that the Tribe has standing to assert any claim that the Tribe believes may relate to the health and well-being of Tribal members. Dkt. # 473, at 11-14. The Tenth Circuit did not find that the Tribe actually has <u>parens</u> <u>patriae</u> standing to raise any claim on behalf of Tribal members; the Tenth Circuit simply noted that the Tribe "brought suit as parens patriae under the common law public trust doctrine." The Tenth Circuit did not hold that the Tribe possesses <u>parens</u> <u>patriae</u> standing to assert any specific claim. Dkt. # 305, at 5 n.1.

licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." Montana, 450 U.S. at 565.  Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  Id. at 566.  Montana applies to any attempt by an Indian Tribe to exercise regulatory or adjudicatory authority over a non-member. Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 651-52 (2001); Phillip Morris USA, Inc. v. King Mountain Tobacco Company, Inc., 569 F.3d 932, 939 (9th Cir. 2009).

The mining defendants argue that the act of filing a lawsuit is an attempt to regulate the activities of non-members, and the case may not proceed unless the Tribe can satisfy one of the Montana exceptions.  The Court finds that the Tribe is not attempting to assert regulatory or adjudicatory authority over non-members.  The Tribe has filed this lawsuit against the defendants in federal court, not tribal court, and the Tribe is not asserting adjudicatory authority over defendants.  Likewise, the Tribe is not attempting to regulate defendants by applying tribal law or regulations to defendants' conduct.  Instead, the Tribe asks the Court to apply Oklahoma law.  If defendants are found liable to the Tribe, it will be the laws of the State of Oklahoma, rather than of the Tribe, that actually regulate and impose liability on defendants' conduct. Montana applies when an Indian tribe seeks to enforce its own laws against non-members or bring non-members into tribal court. The Tribe has not sought to do either, and defendants have not shown that Montana imposes any limitation on the Tribe's authority to file a lawsuit on behalf of Tribal members.  However, the

mining defendants' arguments do not entirely turn on the application of <u>Montana</u>, and some aspects of defendant's motion remain to be considered.

Even if <u>Montana</u> does not apply, the mining defendants argue that the Tribe is a domestic dependent nation with limited sovereign powers and the federal government specifically exercised authority over mineral and mining leases and deprived the Tribe of any authority to regulate these activities.  Dkt. # 618, at 68.  The Tribe responds that these leases were executed in the 1920s and have no relevance to the Tribe's standing to sue at the present time.  Dkt. # 652, at 87.  There is no dispute that the Tribe had no authority to approve or reject mining leases between mining companies and Tribal members on allotted land, and the Department of the Interior was responsible for approving the leases.  However, this Court has previously held that federal regulation of mining on Tribal land does not immunize the mining defendants from liability under Oklahoma law, because these regulations did not expressly authorize the creation of a nuisance on Tribal land.  <u>B.H. v. Gold Fields Mining Corp.</u>, 506 F. Supp. 2d 792 (N.D. Okla. 2007).

> After reviewing all of the sources, the Court finds that none of the legislative or administrative acts authorized defendants to create an environmental hazard. . . . . The regulations cited by defendants are primarily concerned with protecting the economic interest of tribal members, but the Court can not find any legislative intent to regulate mining due to environmental concerns.  The public policy behind the regulation of mining activity on restricted Quapaw lands should not be construed as a legislative authorization of a nuisance . . . .

<u>Id.</u> at 806-07.  For similar reasons, the Court finds that Congressional regulation of mining activity on Tribal lands was for economic, rather than environmental, purposes and the regulations and statutes cited by defendants do not evidence Congressional intent to limit the Tribe's authority to regulate environmental matters on Tribal lands.  In this case, the Tribe is not claiming that the mining defendants violated the mining leases and harmed the economic interests of Tribal members.

Instead, the Tribe alleges that the mining defendants' actions harmed the land itself and the Tribe seeks to restore the land to its condition before mining began in the Tri-State Mining District.  While the Tribe's authority may be limited by other sources, the Court can find no indication that Congress expressly or impliedly deprived the Tribe of the authority to regulate environmental matters on Tribal land through federal regulation of mining leases on Tribal land.

Finally, the mining defendants argue that the process of allotment showed that Congress intended to deprive the Tribe of authority to regulate activities on Tribal lands, and the Tribe lacks parens patriae standing to pursue claims on any land held in title by a Tribal member after allotment of the former Quapaw Reservation.  The Court has already discussed the types of Tribal lands and the Tribe's authority to regulate activities of members and non-members on Tribal land.  Even though the former Quapaw Reservation is no longer intact, it is clear that Congress has not deprived the Tribe of all sovereign authority over allotted land.  Quite to the contrary, federal law permits Indian tribes to act as a trustee for natural resources on tribal lands, and there is no indication that Congress intended to strip an Indian tribe of the ability to file a lawsuit to protect its natural resources.  See 42 U.S.C. § 9607(f) (CERCLA permits an Indian Tribe to act as a natural resources trustee).  Defendants have not shown that the allotment process deprived the Tribe of all authority to regulate environmental matters on property now treated as Tribal land, and the fact that certain land may have been allotted does not negate the Tribe's authority under current law to act in the interests of its members as to formerly allotted land.

## D.

The mining defendants argue that the Tribe has no standing to bring claims for damage to land acquired by the Tribe after the alleged harm to natural resources occurred.  They argue that any

claims for damage to the land belong only to the landowner who owned the land when the alleged injury occurred and the right to file suit does not pass to a subsequent purchaser. Dkt. # 618, at 77-79. The Tribe responds that it may use the <u>parens patriae</u> doctrine to recover for harm to natural resources regardless of when it purchased the land, and it may also recover private damages for harm to land which the Tribe actually owns. Dkt. # 652, at 88-90.

Oklahoma law distinguishes between permanent and temporary nuisances. An injury to land is temporary or non-permanent when "a cause of injury is abatable either by an expenditure of labor or money . . . ." <u>Moneypenney v. Dawson</u>, 141 P.3d 549, 553 (Okla. 2006) (quoting <u>City of Ardmore,</u> 129 P. at 867). If damages are caused by a permanent nuisance, a plaintiff may recover all damages incurred up to the time of filing suit, including lost rental value or reduced value of the property, and the right to file suit for permanent damages terminates if the damaged land is conveyed to a purchaser. <u>St. Louis & S.F.R. Co. v. Stephenson</u>, 144 P. 387, 390-91 (Okla. 1914). If the nuisance is temporary, damages are limited to those suffered up to the time of filing suit and subsequent purchasers may file suit to recover for harm suffered during their ownership. <u>Id.</u> The Oklahoma Court of Civil Appeals has described the running of the statute of limitations for temporary and permanent nuisances:

> The statute of limitations applicable to nuisance claims in Oklahoma is two years. To the extent damages caused by a nuisance are temporary in nature-i.e., damages reasonably capable of abatement-they will be held not permanent and the statute will not begin to run until injury is suffered. Recoverable damages are limited to the two years immediately preceding the filing of the action, however. If the nuisance is not abatable (i.e., is permanent), then the statute begins to run at such time as it becomes obvious and apparent that the land in question has been permanently damaged.

<u>N.C. Corff Partnership, Ltd. v. OXY USA, Inc.</u>, 929 P.2d 288 (Okla. Civ. App. 1996).

35

The Court declines to reach any issue concerning application of the statute of limitations, but will address the mining defendants' argument to the extent it touches on the Tribe's standing to sue. This body of law does not address recovery for NRD but, instead, places limits on recovery for injuries to real property that may be recovered by a private landowner.  None of the cases cited by the mining defendants shows that the temporary or permanent nature of a nuisance deprives a sovereign entity of the ability to file a lawsuit to recover NRD on behalf of its citizens, and the Court finds that the Tribe's standing to pursue claims for NRD is unaffected by this issue.  Oklahoma law clearly establishes that "no lapse of time can legalize a public nuisance," and this true regardless of whether a nuisance is temporary or permanent.  Revard v. Hunt, 119 P. 589, 592 (Okla. 1911).  For land owned by the Tribe and for which it seeks damages in its capacity as a landowner, the Tribe's damages may certainly be limited based on the nature of the nuisance.  The Tribe claims that chat piles and other mining waste have created a temporary, continuing nuisance, and the Tribe may sue for ongoing damages regardless of when it acquired the land.  These claims are subject to the statute of limitations as described in N.C. Corff and, to the extent the Tribe is seeking to recover in its capacity as a landowner, the Tribe's damages are respectively limited.  However, even assuming that the these limitations apply, the mining defendants have not shown that the Tribe lacks standing to pursue a claim for property damage as to land it actually owns.

**IV.**

Two of BNSF's arguments have not been addressed in the Court's discussion of the mining defendants' motion for summary judgment, and are considered separately.  First, BNSF argues that the Tribe has waived any quasi-sovereign interest by failing to bring this lawsuit sooner, and the Tribe may not "suddenly exercis[e]" its sovereign authority over a century after allottment of Tribal

lands.  Dkt. # 616, at 36.  Second, BNSF argues that the Tribe's act of filing the lawsuit was unauthorized under Tribal law, and the lawsuit should be dismissed as an ultra vires exercise of Tribal authority.  Id. at 45.  Concerning the second argument, this is a matter of Tribal law that must be resolved by Tribal courts in the first instance.  See Kaw Nation ex rel. McCauley v. Lujan, 378 F.3d 1139, 1143 (10th Cir. 2004) ("A dispute over the meaning does not 'arise under the Constitution, laws, or treaties of the United States,' as required by 28 U.S.C. §§ 1331 and 1362. This the essential point of opinions holding that a federal court has no jurisdiction over an intratribal dispute."); Sac & Fox Tribe of the Mississippi in Iowa, Election Board v. Bureau of Indian Affairs, 439 F.3d 832 (8th Cir. 2006) ("Jurisdiction to resolve internal tribal disputes [and] interpret tribal constitutions and laws . . . lies with Indian tribes and not in the district courts.").  Even if the Tribe was not authorized to file this lawsuit as a matter of Tribal law, BNSF must ask the Tribal courts to construe Tribal law and determine if the lawsuit was authorized by the appropriate Tribal governmental body.  BNSF has not presented any authority suggesting that the Court can grant summary judgment based on the Tribe's failure to comply with Tribal law, and the Court rejects this argument.

BNSF argues that an Indian tribe may waive its sovereign rights by failing to exercise them in a timely manner and relies on City of Sherill v. Oneida Nation, 544 U.S. 197 (2005).  The Oneida Indian Nation (OIN) is a federally recognized Indian Tribe that historically possessed as much as 600 million acres that is now within the State of New York.  Id. at 203.  In 1788, the OIN entered a treaty ceding all of its lands to the State of New York in exchange for a 300,000 acre reservation. Between 1795 and 1846, the State of New York continued to purchase land from the OIN, but these purchases violated federal law.  Id. at 204-05.  Beginning in the 1970s, the OIN started to reacquire

37

land that was part of the historical reservation in the 1788 treaty with the State of New York and, in the 1990s, the OIN purchased land located within the boundaries of Sherill, New York. Id. at 216-17.  The OIN originally sold this land to the State of New York in 1805.  Sherill attempted to impose property taxes on the land, and the OIN refused to pay on the basis that the land fell within the historical boundaries of its reservation.  Id. at 211-12.  The Supreme Court held that the OIN could not assert its sovereign rights after almost two centuries had passed since it owned the land in question.  Id. at 218-19.  The Supreme Court considered the "longstanding observances and settled expectations" of the parties and noted that less than one percent of the population in the subject land was inhabited by members of the OIN.  Id. at 218.  To acquire new trust land, the OIN had to comply with the condition of 25 U.S.C. § 465, but it could not unilaterally acquire land and declare it exempt from local or state taxation.  Id. at 221.  Given the amount of time that had passed since the OIN originally owned the land, the OIN's belated attempt to revive the reservation status of land would "seriously burden" local and state governments, and the doctrine of laches applied to prevent the Tribe from reasserting sovereign control over land after almost 200 years.  Id. at 220.

BNSF also cites Cayuga Indian Nation of New York v. Pataki, 413 F.3d 266 (2d. Cir. 2005), to support its argument that the Tribe's delay in filing this lawsuit deprives it of standing.  The Cayuga  Nation historically possessed about 3 million acres of land now within the State of New York but ceded all of its land, except for 64,015 acres, to the state in a treaty in 1789.  The 64,015 acres was designated as the Cayuga Nation's "original reservation."  Id. at 268.  The treaty violated the Nonintercourse Act, now codified at 25 U.S.C. § 177, which prevents a state from entering a treaty with an Indian tribe concerning the sale of land.  In a series of subsequent treaties continuing until 1807, the State of New York purchased the Cayuga Nation's original reservation.  Id. at 269.

In 1980, the Cayuga Nation sued the State of New York seeking a declaration that the Cayuga Nation was the owner of the original reservation, because the treaties ceding the land to the state were invalid under the Nonintercourse Act.  Id.  Following summary judgment rulings and a jury trial, the district court entered judgment for the Cayuga Nation on all liability issues and awarded it over $247 million in damages.  The Second Circuit reversed.  The Second Circuit found that Sherill was applicable to "Indian land claims" and determined that the Cayuga Nation could not revive its sovereignty after ceding land to the state almost 200 years before.  The Second Circuit interpreted Sherill to mean that "'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches."  Id. at 277.

The Court finds that this argument is better characterized as the affirmative defense of laches, rather than an attack on the Tribe's standing to pursue any claim raised in the fifth amended complaint, and declines to reach BNSF's argument at this time.  In any event, neither Sherill nor Cayuga Indian Nation shows that the Tribe lacks standing or trustee status to assert its claims against BNSF.  This is not a case where an Indian tribe is attempting to assert its own sovereignty in a dispute against a state or the federal government over possession of property historically belonging to an Indian tribe.  Instead, the Tribe is asserting claims against defendants to abate a potential environmental hazard on land, such as trust or restricted land, over which the Tribe can exercise sovereign authority.  In Sherill, the OIN was attempting to displace local and state governments by asserting its own sovereign authority over land which it had not inhabited for almost 200 years.  By contrast, the Tribe is asserting claims under Oklahoma law concerning an alleged public nuisance on Tribal land.  Laches may provide a defense to some of the Tribe's claims, but the availability of this defense does not deprive the Tribe of standing to sue to protect natural resources on Tribal land.

39

**V.**

Although defendants have shown that there are limits on the Tribe's authority to pursue claims on behalf of its citizens, the Court finds that the Tribe has standing to pursue claims for NRD. Defendants have shown that Oklahoma law may limit the remedies available to a plaintiff for a nuisance claim, whether it is a public or private nuisance claim, and the Tribe's damages calculations based on loss of use of the land will have to be revisited. Damages for lost beneficial use of the land flow to the private landowner, not a sovereign asserting a claim on behalf of its citizens. However, a private citizen could not recover damages for harm to natural resources, and the Tribe may be entitled to damages under a model more closely tied to actual harm to the natural resources. The Court also notes that it may award injunctive relief in the form of abatement, or compensatory damages for abatement, but any such order must be stayed to the extent that abatement would interfere with the EPA's work at Tar Creek. See B.H., 506 F. Supp. 2d 792 (CERCLA did not preempt availability of abatement remedy under Oklahoma law, but any claim for injunctive relief should be stayed if granting relief would interfere with the EPA's remedial efforts at Tar Creek). The parties have not fully briefed the remedies available for NRD under Oklahoma law and the Court declines to offer any opinion on the nature of permissible remedies, but it is sufficient to note that the Tribe has demonstrated it has standing to proceed with its claims.

**IT IS THEREFORE ORDERED** that Defendant Burlington Northern Santa Fe Railway Company's Motion for Summary Judgment (Dkt. ## 616, 628) and the Motion for Summary Judgment on Phase I Issues and Brief in Support on Behalf of Defendants Blue Tee Corp., The Doe Run Resources Corporation, Gold Fields Mining, LLC, and NL Industries, Inc. (Dkt. # 618) are **granted in part** and **denied in part**. The Tribe may proceed with its claims for NRD to the extent

40

it is asserting a quasi-sovereign interest in recovering damages to natural resources within the Tribe's authority.  However, the Tribe lacks standing to recover damages for the claims of private landowners within the former Quapaw Reservation, including any damages concerning lost beneficial use of land owned by Tribal members.  Defendants' motions are denied as to all other issues.

**IT IS FURTHER ORDERED** that the parties shall submit a joint agreed proposed scheduling order for phase II of this case no later than **September 18, 2009**.

**DATED** this 2nd day of September, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT